# Exhibit 7

# Daniel Wolstein, PhD, CRC, PVE, CLCP, CRV, IPEC, ABVE/F, LRC

One University Plaza, Suite 302 ▪ Hackensack, New Jersey ▪ 201-343-0700
Dan@KincaidVocational.Com

## Profile

- Rehabilitation Needs
- Vocational Evaluation
- Labor Market Analysis
- Employability Assessments
- Social Security Vocational Expert
- Job Search Activities

- Wage Data Knowledge
- National/State Wage Research
- Vocational Rehabilitation
- Assistive Technologies
- Career Counseling
- Test Administration and Analysis

## Experience:

➢ Principal, Kincaid Wolstein Vocational and Rehabilitation Services, 2006- Present
*Vocational Counselor and Consultant Evaluator*
- Composing labor market surveys and job analysis reports for company
- Performing transferable skills analyses
- Vocational evaluation and assessment
- Career counseling needs including all aspects of the job search process
- Assessing vocational history, educational history, past earnings and medical history for vocational reports
- Counseling consumers in the evaluation, planning and treatment processes of rehabilitation counseling
- Diagnostic interviews for career counseling, personal injury and matrimonial cases
- Researching assistive technologies
- Assessing rehabilitation needs
- Administering and interpreting a wide range of assessments and instruments

## Education

- East Carolina University, Graduate School
  Doctoral degree in Rehabilitation Counseling and Administration, 2014
- Rutgers University (formerly UMDNJ)
  Master's in Rehabilitation Counseling, 2010
- Ramapo College of New Jersey
  Bachelor of Arts. Major: Psychology, 2008

## Affiliations and Credentials

- Certified Rehabilitation Counselor since March 2010
- Professional Vocational Evaluator since February 2015

Revised 01/24/2020

- Certified Life Care Planner since March 2015
- Certified Rehabilitation Vocationologist since April 2015
- International Psychometric Evaluation Certification since May 2015
- Holds Memberships at professional associations
  - International Association of Rehabilitation Counselors
  - American Board of Vocational Experts
- American Board of Vocational Experts panel for Test Development 2016
- Licensed Rehabilitation Counselor since February 2017
- Director-at-Large: IPEC Test Committee Chair (American Board of Vocational Experts; 2017-2018 term)
- IPEC Test Committee Member (American Board of Vocational Experts (2018-Present)
- Treasurer (American Board of Vocational Experts; 2018-2020 term)

## Presentations and Research

- Lecture for Social Security Administration with Jeff Truthan: November 2019
- Lecture at IARP with Jeff Truthan on sedentary unskilled occupations: November 2019
- Panel Presentation Rutgers School of Health-Related Professions:
  - January 2019, January 2020
- Class Lecture at Rutgers School of Health-Related Professions:
  - March 2019, January 2020
- National Organization of Social Security Claimant Representatives: April 2018
  - Presented with Jeff Truthan on research efforts for 137 sedentary unskilled jobs
- Colorado State Bar (Denver, Colorado): 2017
  - Presented on Surveillance-system Monitor Research
- Lecture on Vocational Forensics: Ramapo College, 2015, 2016, 2017
- Published in the Journal of Forensic Vocational Analysis (Winter 2016 issue)
  - Surveillance System Monitors in the Work Force (April 2017)
- National Council on Rehabilitation Education (NCRE) 2012 Conference on Organizational Reengineering for State Vocational Agencies
- Published in the Journal of Applied Rehabilitation Counseling in 2010 under Dr. Mark Chae
  - Worked on extra-curricular research with Dr. Mark Chae
  - Presented publication at Winter Conference hosted at Columbia University
- Composed a curriculum for a skills group for job seekers at DVR
- 1st Annual Research Day at the University of Medicine and Dentistry of New Jersey
  - Presentation based on the skills group held at the Division of Vocational Rehabilitation

## Clinical Experience, Internships, and Practicums

- Clinician for the Office of Workers Compensation from 2015 - Present
- Volunteer Clinician at Jewish Vocational Services from 2014 – Present
  - Returning individuals with disabilities to work
  - Duties include job placement, job searching, career counseling, resume writing, interviewing skills, and general job counseling
- Provided clinical services at East Carolina University's Navigate Clinic in 2012
- Completed 100-hour Practicum at Vocational Rehabilitation at Vidant Health Center
- Completed 600-hour internship at the Division of Vocational Rehabilitation, NJ
  - Composed a curriculum for a skills group based on the Boston University Approach
- Completed 100-hour practicum at the Division of Vocational Rehabilitation, NJ
  - Worked with individuals to develop rehabilitation plan and return to work

## Additional

- Presidential Citation from ABVE President Dr. Scott Whitmer (2019)
  - Surveillance System Monitor article and assistance on IPEC credential
- Beta tester for SkillTran Online Transferable Skills Analysis Program (2018)
- Developed website for the Vocational Rehabilitation Counseling Coalition (2017)
- Social Security Vocational Expert (2015-2019)
- Forensic Vocational Rehabilitation Course: Orientation to Forensic Rehabilitation Consultation at the University of Florida (2015)
- Assisted with implementation of the IPEC through peer application review
- Courses Taught: REHB 3000 Introduction to Rehabilitation at East Carolina University
- Courses Assisted: ADRE 5100 Occupational Analysis and Career Counseling
- Invited Reviewer (2014). Article for the Vocational Evaluation and Career Assessment Professionals Journal
- Assisted in CACREP Accreditation Implementation of Program Evaluation Standards for East Carolina University



## VOCATIONAL EVALUATION AND EARNING CAPACITY ANALYSIS

**PREPARED BY:** Kincaid Wolstein Vocational and Rehabilitation Services
One University Plaza ~ Suite 302
Hackensack, New Jersey 07601
Phone: (201) 343-0700
Fax: (201) 343-0757

**PREPARED FOR:** Ameer Benno, Esquire
Block, O'Toole & Murphy, LLP
One Penn Plaza, Suite 5315
New York, New York 10119
Phone: (212) 736-5300

**REGARDING:** Lucia Almonte

**DATE OF BIRTH:** ▌

**REPORT DATE:** June 3, 2020

Almonte, Lucia                                                                                          2

## Table of Contents

CERTIFICATION.................................................................................................. 3

DISCLOSURE..................................................................................................... 3

CASE CONCEPTUALIZATION MODEL: ......................................................... 4

REFERRAL INFORMATION .............................................................................. 5

EVALUATION METHODOLOGY ....................................................................... 5

EVALUATION ASSUMPTIONS ........................................................................ 6

LEGAL EXHIBITS AND DOCUMENTS REVIEWED......................................... 6

FAMILY/SOCIAL/EDUCATIONAL/MILITARY BACKGROUND........................ 6

EMPLOYMENT EXPERIENCE ......................................................................... 7

VOCATIONAL PROFILE AND EMPLOYMENT EXPERIENCE ANALYSIS.................. 8

MEDICAL RECORDS REVIEWED .................................................................. 10

MEDICAL HISTORY SUMMARY .................................................................... 12

SELF-REPORT ............................................................................................... 22

VOCATIONAL TESTING................................................................................. 24

    Wonderlic Personnel Test (Form IV – Spanish Version):........................... 24

    Wide Range Achievement Test, Revision 5 (WRAT-V): ............................ 24

    Self-directed Search Form E, 4th Edition (Spanish Version): .................... 25

POST-INJURY VOCATIONAL PROFILE ........................................................ 26

TRANSFERABLE SKILLS ANALYSIS ........................................................... 27

ANALYSIS OF EMPLOYABILITY ................................................................... 29

VOCATIONAL REHABILITATION................................................................... 31

    Assistive Technology ................................................................................. 33

ANALYSIS OF EARNINGS/EARNINGS CAPACITY...................................... 35

SUMMARY ...................................................................................................... 37

RESOURCES AND REFERENCES................................................................. 40

MCCROSKEY TRANSFERABLE SKILLS ANALYSIS ................................... 41

**Kincaid Wolstein Vocational and Rehabilitation Services**
One University Plaza, Suite 302, Hackensack, New Jersey 07601
www.KWVRS.com ■ Tel: (201) 343-0700 ■ Fax: (201) 343-0757

Almonte, Lucia                                                                                                    3

## CERTIFICATION

This is to certify that I am not related to any of the parties to the subject action, nor do I have any present or intended financial interest in the outcome of this case beyond the fees due for professional services rendered in connection with this report and possible subsequent services.  Further, I certify that my professional fees are not contingent upon the resultant financial awarding of this matter but are based on the time expended on the services provided to counsel in connection with the subject action.

This is to further certify that all assumptions, methodologies and calculations utilized in this evaluation and assessment report are based on current knowledge and methods applied in the determination of employability, labor market access, job placement and earnings capacity.

## DISCLOSURE

Ms. Almonte was advised about the purpose of the evaluation. She was advised that the evaluation was being conducted within the parameters of litigation and that any information obtained during the evaluation was not confidential.

In addition, Ms. Almonte was advised that this was a one-time evaluation, forensic in nature, and that no client-counselor relationship exists or was implied; that no direct rehabilitation services would be provided to him by this office; and that an unbiased, objective evaluation of her employability, labor market access, and earning capacity, post injury, was the only purpose of this interview.

She was also advised that Kincaid Wolstein Vocational & Rehabilitation Services maintains confidentiality of all medical records. Once the case is resolved, the corporate policy is to destroy the case records.  Ms. Almonte indicated understanding of these rules of procedure and conduct and agreed to proceed.

Almonte, Lucia                                                                                     4

## CASE CONCEPTUALIZATION MODEL:

Case conceptualization for forensic vocational consulting should rely upon a methodology that is reliable and valid, since these aspects are crucial to an objective vocational evaluation.  It is important to select a case conceptualization model that is referenced in the literature or regarded as a sound methodology.[1]  The RAPEL model defines five domains: rehabilitation plan, access to the labor market, placeability, earning capacity, and labor force participation.  Field (2008) states that RAPEL is a widely inclusive model, encompassing many resources ranging from labor market access, placeability considerations, attention to earning capacity issues, and other facets that assist in case conceptualization.[2]  Robinson (2014) states that RAPEL is the most frequently referenced methodology for earning capacity analysis, with high levels of content validity and face validity.

*Rehabilitation plan:* The rehabilitation plan is an individualized plan tailored to the specific needs of the evaluee, and all factors affecting return to work should be considered.  In this vocational evaluation, rehabilitation considerations and job accommodations are often found in the Vocational Rehabilitation and Assistive Technologies sections, though they may be absent depending on the viability of rehabilitative efforts for the evaluee.

*Access to the labor market:* Access to the labor market is based on the evaluee's ability to obtain work, or, in other words, personal access to the competitive labor market.  This issue is addressed in the Analysis of Employability section via the transferable skills analysis.

*Placeability:* Placeability is also an aspect of vocational evaluation that uses the RAPEL model.  Placeability can be regarded as the ability to secure employment based on the interaction of an individual's employability and factors in the community, such as job availability and employer attitudes.[2] The transferable skills analysis considers the availability of jobs down to the local labor market level.  The specificity of the McCroskey Transferable Skills Programs allows analysis at the county level.

*Earning Capacity:* Earning capacity is a function of the capacity to perform work.  Pre-injury earning capacity must be considered versus post-injury earning capacity.[2] Any difference in earning capacities attributable to loss of access to the labor market can result in lost earnings, which are addressed in the Analysis of Earnings/Earning Capacity section.

*Labor force participation:* Labor force participation represents issues of working life.  Loss of access to the competitive labor market can result in a reduced worklife expectancy, including being unable to hold employment (total absence from the labor market and substantial gainful activities), being limited to part-time work, or being able to carry on a full-time work schedule.[2] Labor force participation is also addressed in the Analysis of Employability section, and, depending upon the needs of the evaluation, in a Worklife Expectancy section as well.

---

[1] International Associate of Rehabilitation Professionals. http://www.rehabpro.org/publications/standards
[2] Field, T. (2008). Estimating earning capacity: Venues, factors, and methods. *Estimating Earning Capacity,* 1(1), 5-40.

**Kincaid Wolstein Vocational and Rehabilitation Services**
One University Plaza, Suite 302, Hackensack, New Jersey 07601
www.KWVRS.com ▪ Tel: (201) 343-0700 ▪ Fax: (201) 343-0757

Almonte, Lucia                                                                5

## REFERRAL INFORMATION

Ms. Lucia Almonte's case was referred for Vocational Assessment and determination as to whether or not, as a result of injuries allegedly incurred in a motor vehicle accident on April 18, 2018, she sustained a Vocational Impairment or Work Disability, and if so, how that impairment or disability might affect her earning capacity.  In addition, determination was made as to whether she would benefit from vocational rehabilitation services.  A Vocational Evaluation was conducted based upon assessment of pertinent information provided regarding Ms. Almonte's age, education, past relevant employment and earnings history, and current employment and earnings.  The information gathered pertains to the relevant vocational factors for Ms. Almonte in relation to the competitive employment market.

## EVALUATION METHODOLOGY

Records and data regarding Ms. Almonte were provided by the law offices of Block, O'Toole & Murphy, LLP, for review and use in evaluating her employability and earning capacity.  Ms. Almonte was interviewed on February 26, 2020, at the offices of Block, O'Toole & Murphy, LLP, located in New York, New York.  An interpreter, Ms. Ana Pena, was present to translate between English and Spanish.  The following procedures were followed:

1. An in-depth interview was conducted to obtain relevant background information with regard to Ms. Almonte's age, education, present employment and earnings status, past employment and earnings experience, and current work/life status.

2. Vocational testing was conducted to ascertain vocational trait and interest factors.  Ms. Almonte's test results were utilized to compare her aptitudes to job requirements.  The following tests were administered:

   - Wonderlic Personnel Test (WPT)
   - Wide Range Achievement Test (WRAT-V)
   - Self-directed Search (SDS)

3. The employment history was researched using standard vocational reference materials that are detailed in the Resources and References section at the end of this narrative.  This employed the **McCroskey Transferable Skills Program**, a job-person matching system that enables the comparison of individual abilities and job requirements to see where the two intersect.  This system, which has been shown to have a high degree of reliability and validity, employs the U.S. Department of Labor (DOL) worker trait factor system as a means of comparing individual capacities against the mental and physical demands of jobs as they exist in the local labor market.  In addition, the **McCroskey Vocational Quotient System** was used to analyze further the employability of Ms. Almonte.  Labor market and wage information was gathered for the New York State area.

Almonte, Lucia                                                                              6

4. From the information generated and reviewed, a pre-injury profile of worker trait capacity levels was established and used to compare the pre-injury capacities of Ms. Almonte against the demands of jobs as they exist in the local labor market. Educational attainment level and vocational preparation were also considered.

5. Medical information was received and reviewed to determine the nature, extent, and duration of injuries sustained and any permanent functional limitations resulting from injury. This information was then used to adjust the pre-injury profile, leading to the development of a post-injury vocational profile in the context of Ms. Almonte's injuries and the functional impairments and limitations resulting from injury.

6. Both profiles were then compared to profiles for all 12,775 jobs in the **Dictionary of Occupational Titles**, combined with a labor market survey of the most frequently hired for jobs in the State of New York, 2020. This was done using the **McCroskey Transferable Skills Program**, which evaluates vocational information in accordance with U.S. Department of Labor criteria (worker trait-factor capacity levels).

7. From this analysis, further assessment was then done to ascertain pre- and post-injury employability, labor market access, job placement potential, vocational rehabilitation needs, and wage-earning capacity at this time.

## EVALUATION ASSUMPTIONS

This vocational evaluation and earning capacity analysis is based upon the skills, training, knowledge, clinical discretion, and professional experience of the author. This evaluation assumes the following:

1. The medical records were provided in their entirety and accurately reflect the medical condition and functional abilities of the evaluee;

2. The evaluee provided true and accurate information in the vocational interview;

3. All testing administered was completed to the best of the evaluee's abilities;

4. The evaluee's employment history, education, and training demonstrate her vocational capacities and ability to benefit from job training.

## LEGAL EXHIBITS AND DOCUMENTS REVIEWED

Income Tax Returns of Lucia Almonte: 2014–2018.

Verified Bill of Particulars: October 17, 2019.

## FAMILY/SOCIAL/EDUCATIONAL/MILITARY BACKGROUND

Ms. Almonte indicated that she entered but never completed the 12th grade at Freeport High School, located in Freeport, New York.  She did not obtain a general equivalency diploma.  Ms. Almonte has not served in the military.  No other training or education is noted.

Ms. Almonte was born in Santo Domingo, Dominican Republic, and moved to the United States in December 1997 (she obtained a green card).  She is the mother of two: Richard Garcia (DOB: ███████) and Nomel (DOB: ███████).  She currently resides in Freeport, Nassau County, New York.  Ms. Almonte has a Class D New York State automobile driver's license.  Prior to injury, she noted enjoying exercising at the gym and dancing, which she states she is no longer able to perform at pre-injury levels.

## EMPLOYMENT EXPERIENCE

Ms. Almonte reported that from 2007 to April 18, 2018, she had worked as a House Cleaner in the Long Island, New York State, area.  Following her injury on April 18, 2018, she was not able to return to work in her customary occupation as a House Cleaner, but was able to maintain her employment as a Secretary.  Ms. Almonte's past work experience includes House Cleaner, Secretary, Hostess, Retail Worker, Sales Clerk, and Cashier job positions.  Ms. Almonte's employment experience, as related by him, is as follows:

| | |
|---|---|
| **Position:** | **Hostess** |
| Employer: | IHOP |
| Location: | Staten Island, New York |
| Dates: | 2018, about 5 months |
| Earnings: | $9 to $10 per hour, 30 to 40 hours per week |
| Duties: | Greeted customer, escorted customers to tables, and took payment in cash and by credit card. |

| | |
|---|---|
| **Position:** | **Secretary** |
| Employer: | Barber Shop |
| Location: | West Babylon, New York |
| Dates: | February 2017–Present |
| Earnings: | $120 per day, 5 days per week |
| Duties: | Charges clients, takes payments in cash, sweeps and mops once per week, answer telephones, greets customers, and makes appointments. |

| | |
|---|---|
| **Position:** | **House Cleaner** |
| Employer: | Self-employed |
| Location: | Long Island, New York |
| Dates: | 2007–April 18, 2018; no RTW |
| Earnings: | Paid per job up to $30 per hour; up to $1,200 per week |
| Duties: | House Cleaner job duties, vacuumed, mopped, swept, cleaned |

Almonte, Lucia                                                                                           8

entire kitchen and appliances, dusted, did bedrooms and bathrooms.  Brought her own cleaning supplies.

**Position:**     **Sales Clerk**
Employer:     Foot Locker
Location:     Long Island, New York (Roosevelt Field Mall)
Dates:        After Aeropostale
Duties:       Assisted customers with their shopping needs, retrieved merchandise, and allowed customers to try on footwear.

**Position:**     **Retail Worker**
Employer:     Aeropostale
Location:     Garden City, Long Island (Roosevelt Field Mall)
Dates:        2008/2009, CNR length of employment
Duties:       Folded clothes and restocked shelves with clothing.

**Position:**     **Sales Clerk**
Employer:     Payless Shoe Store
Location:     Hempstead Turnpike, Long Island
Dates:        Before Aeropostale
Duties:       Same as Foot Locker, and also operated cash register.

**Position:**     **Cashier**
Employer:     Compare Food
Location:     Freeport, Long Island
Dates:        1998–2000
Duties:       Operated cash register, tallied items, took payment in cash and by credit card.

## VOCATIONAL PROFILE AND EMPLOYMENT EXPERIENCE ANALYSIS

According to Shahnasarian (2011), "Establishing a benchmark of an individual's premorbid earning capacity is a prerequisite to analyzing potential comparative post-incident earning capacity changes.  Trends in earnings history, projections about the demand for skills, and a professional analysis of a person's pre-incident career development prospects facilitate the formulation of pre-incident earning capacity estimates."[3]

The jobs that Ms. Almonte has successfully performed in the past 15 years were researched in the U.S. Department of Labor's **Dictionary of Occupational Titles**, along with addendum publications that include the **Revised Handbook for Analyzing Jobs**, the **O*Net Dictionary of Occupational Titles**, the **Selected Characteristics of Occupations**, and **Occupational Outlook Handbook**.  The job definitions provided from the Dictionary of Occupational Titles are not intended to be exact

---

[3] **Assessment of Earning Capacity, 3rd Edition,** Shahnasarian, M. 2011.  Lawyers and Judges Publishing Company, Inc. Tucson, Arizona.

Almonte, Lucia                                                                                                            9

representations of the jobs performed in Ms. Almonte's employment history.  Instead, the job definitions are intended to provide a synthesis of general information that most closely encapsulates the skills, abilities, educational requirements, and physical capacities that are required to perform a specific job position or array of work tasks.  It is duly noted that each occurrence of a job position in the workforce varies, to some degree, with unique worksite and employer needs.

Reference to these job titles is important, since they have known capacity statements attached to them, which represent modal ability levels associated with the types of jobs Ms. Almonte has performed in the past.

| DOT Number | DOT Title | VQ | Skill Level – Specific Vocational Preparation[4] | Physical Demands |
|---|---|---|---|---|
| 301.687-014 | Day Worker (Housecleaner) | 82.38 | SVP = 2 (Unskilled) | Medium |
| 237.367-038 | Receptionist | 95.38 | SVP = 4 (Semi-Skilled) | Sedentary |
| 290.477-014 | Sales Clerk | 97.23 | SVP = 3 (Semi-Skilled) | Light |
| 352.667-010 | Hostess | 95.27 | SVP = 3 (Semi-Skilled) | Light |

These jobs require a range of Sedentary to Medium physical duty on a five-point scale (sedentary, light, medium, heavy, and very heavy).

According to the **Dictionary of Occupational Titles**, sedentary work is defined as follows:

> Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time but may involve walking or standing for brief periods of time.  Jobs are Sedentary if walking and standing are required only occasionally and all other Sedentary criteria are met.

According to the **Dictionary of Occupational Titles**, light work is defined as follows:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Sedentary Work.  Even though the weight lifted may only be a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree: or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when a job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

Medium work is defined by the **Dictionary of Occupational Titles** as follows:

---

[4] SVP 1 = <5 Days, SVP 2 = 5-30 Days, SVP 3 = 1-3 Months, SVP 4 = 3-6 Months, SVP 5 = 6-12 Months SVP 6 = 1-2 Years, SVP 7 = 2-4 Years, SVP 8 = 4-10 Years, SVP 9 = >10 Years

Almonte, Lucia                                                      10

Exerting 20–50 pounds of force occasionally and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects.  Physical Demand requirements are in excess of those for Light Work.

These jobs require combined aptitudes in the following areas:

| Code | Aptitude | Level |
|------|----------|-------|
| R | Reasoning | Low Average |
| M | Mathematics | Below Average |
| L | Language | Low Average |
| S | Spatial Perception | Below Average |
| P | Form Perception | Below Average |
| Q | Clerical Perception | Low Middle Average |
| K | Motor Coordination | Below Average |
| F | Finger Dexterity | Below Average |
| M | Manual Dexterity | Low Middle Average |
| E | Eye Hand Foot Coordination | Very Low |
| C | Color Discrimination | Below Average [5] |

These jobs are rated in the Below Average to Average range on the **McCroskey Vocational Quotient Scale**, a standardized empirically-derived index of vocational difficulty that considers all of the worker traits that are measures of mental and physical **capacity** in order to derive an overall statistical index of job difficulty.  This index ranges from a low of approximately 72.00 to a high of about 154.00.  The VQ distribution for all jobs in the DOT has been transformed (McCroskey, 1992) to a Mean of 100.00 and a Standard Deviation of 15.00.  In general, the higher the VQ, the more difficult and rewarding is the job.  Jobs with VQs ranging between 85.00 and 115.00 fall within the "average range" of overall job difficulty.

### Conclusion(s) from Vocational Profile:

Ms. Almonte demonstrated the ability to perform work successfully as a House Cleaner, Secretary, Hostess, Retail Worker, Sales Clerk, and Cashier.  She showed the ability to perform duties, develop skills, and acquire the knowledge and training necessary to obtain and maintain employment in these job positions.

### MEDICAL RECORDS REVIEWED

Mercy Medical Center
    Leeva Mathew, M.D.
            Emergency Department Record: 04/19/18
    Conellia Ha, M.D.

---

[5] Very Low – Under 10th %ile; Below Average – 10th to 33rd %ile; Average – 34th to 65th %ile; Above Average – 66th to 89th %ile; Superior – Over 89th %ile.

Almonte, Lucia                                                                                11

            Imaging Report: 04/19/18
        Daniel Machleder, M.D.
            Imaging Reports: 04/19/18 (×3)
        Verma Gaurav, M.D.
            Emergency Department Record: 06/19/18
        Kurt Dischner, M.D.
            Emergency Department Records: 08/13/18, 03/23/19
        *Alexandre De Moura, M.D.
            Operative Report: 02/26/19
        Benjamin Yam, M.D.
            Imaging Report: 03/23/19
        Mridul Kumar, M.D.
            Emergency Department Record: 03/27/19
        *Angel Macagno, M.D.
            Operative Report: 03/02/20

David Suesserman, D.C.
            Chiropractic Notes: 05/08/18, 07/11/18

Nassau Health Wellness
        Joseph Louis, M.D.
            Medical Records: 05/09/18, 07/09/18
        Nasar Shahid, M.D.
            Electrodiagnostic Study: 08/06/18
            Procedure Notes: 08/06/18, 08/20/18, 09/10/18, 09/17/18
        Emerth Lance Coburn, M.D.
             Medical Record: 08/27/18

Physical Therapy
        Multiple Providers
            PT Notes: 05/09/18–06/25/19

Redtree Radiology
        Eliezer Offenbacher, M.D.
            Imaging Reports: 07/09/18, 07/16/18

Stand-Up MRI of Carle Place
        Steven Winter, M.D.
            Imaging Reports: 07/24/18 (×2)

Harvey Manes, M.D.
            Medical Record: 07/26/18

Oradell Surgical Center
        *Nasar Shahid, M.D.
            Operative Reports: 08/18/18, 09/15/18

Almonte, Lucia                                                                                          12

Sports Medicine and Spine Rehabilitation
    Faguna Patel, D.O.
        Medical Records: 11/08/18, 01/17/19
    Joseph Gregorace, D.O.
        Medical Records: 05/03/19, 05/31/19

New York Spine Institute
    *Alexandre De Moura, M.D.
        Medical Records: 11/26/18, 02/21/19, 03/07/19, 03/29/19, 04/05/19,
        05/17/19, 08/16/19, 11/15/19, 11/25/19
    Alan Greenfield, M.D.
        Imaging Reports: 02/21/19, 11/18/19
    Adam Landskowsky, M.D.
        Imaging Reports: 03/07/19, 05/17/19, 08/16/19, 11/15/19
    Timothy Roberts, M.D.
        Medical Record: 12/04/19
    *Angel Macagno, M.D.
        Medical Records: 12/12/19, 01/02/20
    John Ventrudo, M.D.
        Medical Record: 12/27/19

Orlin & Cohen Medical Specialist Group
    Moiz Manaqibwala, M.D.
        Medical Records: 12/14/18, 01/25/19, 03/14/19

Branch Orthopedics
    *Chris Moros, D.O.
        Medical Records: 04/08/19, 04/25/19, 07/02/19

North Shore Surgi-Center
    *Chris Moros, D.O.
        Operative Report: 04/18/19

Edwin Richter III, M.D.
        Physiatric Evaluation: 02/20/20

* Please note that an asterisk next to the name of a provider indicates that he or she may be found in multiple locations throughout this medical summary.

## MEDICAL HISTORY SUMMARY

The medical records reviewed for this evaluation indicate that Ms. Almonte was involved in a motor vehicle accident on April 18, 2018.  She was a belted driver that was hit on the driver's side by a truck when she was slowing down near a toll booth.  She sustained injuries to her neck and back.  She underwent cervical spine surgery in

Almonte, Lucia                                                                           13

February 2019, a shoulder arthroscopy in April 2019, and lumbar spine surgery in March 2020.  She has past medical history of cesarean section, breast surgery, cornea replacement, and liposuction.   A synopsis of the medical records is as follows:

04/19/18 Leeva Mathew, M.D.: Emergency Department Record

> History:
> 36-year-old female presenting for eval of neck pain, headache, and low back pain status post MVC which occurred last night.  Patient states that she was driving on the highway, slowing down for a toll booth, when a big cargo truck swerved into her lane and hit the driver's side door.  Patient states that she was able to ambulate after the incident.  She denies hitting her head, LOC, or amnesia to the event but is complaining of dizziness and vomiting ×3 yesterday with tingling down left arm…

04/19/18 Daniel Machleder, M.D.: Imaging Reports

> X-ray chest: No focal pulmonary parenchymal consolidation, pleural effusion or pneumothorax.

> CT brain: No acute intracranial hemorrhage, mass-effect or midline shift.

> CT cervical: No definite evidence of acute trauma.  Straightening of normal cervical spine lordosis may be on the basis of positioning versus pain and muscle spasm.  A small calcified/ossified fragment anteroinferior to the C6 vertebral body is new compared to the study of 09/16/14.  This is sclerosed and with no obvious osseous donor and is felt to be on the basis of chronic degenerative disc osteophyte from early degenerative change, rather than due to acute trauma injury.  Clinically correlate.

04/19/18 Conellia Ha, M.D.: Imaging Report

> X-ray lumbar: Degenerative change with facet arthropathy L5-S1.  No fracture or subluxation.  Right pelvic calcifications likely representing phleboliths.  Clinical correlation recommended.

05/08/18 David Suesserman, D.C.: Chiropractic Evaluation

> Diagnoses:
> 1.  Spine strain/sprain.
> 2.  Thoracic spine strain/sprain.
> 3.  Lumbar spine strain/sprain.
> 4.  Muscle spasm
> 5.  Right hip deferred to orthopedic surgery.

Almonte, Lucia                                                                                    14

Plan: I recommend chiropractic care 3 times a week for the next 4 weeks.  If pain persists, further diagnostic testing, such as MRI, should be obtained.

05/09/18 Joseph Louis, M.D.: Comprehensive Evaluation

Chief Complaints: …  Patient complaints of intermittent headaches.  Patient complains of blurry vision in front of eyes.  Patient is unable to find a comfortable position when sleeping.  Patient states she has depression (mood swings, anxiety, stress, nightmares about the accident…

Present Disability: Moderate disability 50-74%

Work History: The patient is presently employed on a full time basis as a secretary.  The patient continues to work with some moderate discomfort.  The patient is working at this time.

Causality: According to my best judgment, if the history given by the patient is accurate, the above-mentioned accident seems to be the causative factor of the patient's symptomatology.

Prognosis: Due to the mechanism of injury inherent in this case and the type of trauma suffered by this patient, healing of the supporting tissues of the spine and other involved joints frequently becomes less effective.  It its therefore expected that the patient will experience frequent exacerbations of symptoms during which time patient may need to take time off regular activities to receive treatment.

06/19/18 Verma Gaurav, M.D.: Emergency Department Record

Chief Complaints:
1.  Dizziness, chills.
2.  Headache.

History:
…patient with intermittent headache since this morning…  Patient admits to nausea, 2 episodes of NBNB vomiting, lightheadedness, mild sensitivity to light and noise…  Pt states she had recent eye surgery 2 weeks ago to repair a corneal abrasion…

Diagnoses:
1.  Elevated BP without diagnosis of hypertension.
2.  Acute nonintractable headache, unspecified headache type.

07/09/18 Eliezer Offenbacher, M.D.: Imaging Report

MRI left shoulder: No fracture or bone bruise.  No ligament or tendon disruption is evident.  The glenohumeral joint appears intact, without tear of the glenoid

Almonte, Lucia                                                                          15

labrum, or disruption of the shoulder capsule.  Glenohumeral joint effusion.  Fluid within the subcoracoid bursa along the anterior margin of the glenoid process consistent with bursitis.  A posttraumatic etiology is not excluded.

07/16/18 Eliezer Offenbacher, M.D.: Imaging Report

MRI lumbar: Straightening of the lumbar lordosis.  Mild anterior bulging of the L2-L3 disc without posterior contour abnormality or neural impingement.  The L3-L4 disc demonstrates mild anterior bulging and osteophyte formation without significant posterior contour abnormality or neural impingement.  The L4-L5 disc demonstrates mild anterior bulging and osteophyte formation, and a focal left paracentral disc herniation flattening the ventral aspect of the thecal sac to the left of midline.  No significant deformity or compression of the sac however is evident and no impingement on exiting nerve roots is present at this level.  The L5-S1 disc is normal in contour.

07/24/18 Steven Winter, M.D.: Imaging Reports

MRI right shoulder:  Supraspinatus tendon inhomogeneous and bulbous extending anterior laterally towards its attachment site on the humerus where there is superimposed shallow partial-thickness 1 cm bursal surface tearing extending toward its anterior lateral attachment on the humerus where there is obscuring of the peritendinous fat with peritendinous edema.  Anterior laterally down sloping type II acromial configuration which abuts the underlying supraspinatus with compromise of the subacromial space.  Synovial fluid at the glenohumeral articular surface and subscapularis recess.

MRI cervical: C5-C6 posterior disc herniation with a focal extrusion in the midline that impresses on the ventral margin of the cord with borderline central spinal stenosis.  C6-C7 left posterior disc herniation impressing on the left ventral margin of the cord encroaching peripherally toward the proximal left neural foramen.  C3-C4 and C4-C5 posterior disc bulges impressing on the ventral thecal sac with a superimposed left posterolateral focal disc herniation at C4-C5 encroaching into the left anterior recess.  Cervical kyphosis with the apex at C5-C6 with evidence for muscular spasm.

07/26/18 Harvey Manes, M.D.: Orthopedic Consultation

Diagnosis: Left shoulder bursitis.

08/06/18 Nasar Shahid, M.D.: Electrodiagnostic Studies

EMG/NCV upper: EMG - abnormal study.  The above electrodiagnostic study reveals evidence of the left C5-C6 cervical radiculopathy.  NCV - normal study.  The above electrodiagnostic study of both upper extremities revealed no evidence of peripheral neuropathy.

Almonte, Lucia                                                                                              16

EMG/NCV lower: EMG - abnormal study.  The above electrodiagnostic study reveals evidence of left L4-L5 lumbosacral radiculopathy.  NCV - normal study. The above electrodiagnostic study of both lower extremities revealed no evidence of peripheral neuropathy.

08/06/18 Nasar Shahid, M.D.: Procedure Note

Procedure: Trigger point injection, cervical.

08/13/18 Kurt Dischner, M.D.: Emergency Department Record

Chief Complaints:
1.  Sore throat.
2.  Otalgia.
3.  Headache.
4.  Fever.

Disposition: Eloped.

08/18/18 Nasar Shahid, M.D.: Procedure Note

Pre-Op Dx:    Lumbar radiculopathy, lumbar HNP.

Post-Op Dx:  [None given.]

Procedure:    Lumbar transforaminal epidural injection under fluoroscopic guidance at bilateral L4-L5 and left L5-S1.

08/20/18 Nasar Shahid, M.D.: Procedure Note

Procedure: Trigger point injections, 2nd cervical.

08/27/18 Emerth Coburn, M.D.: Medical Record

Diagnostic Impression:
1.  Sprain of joints and ligaments, other parts of neck.
2.  Cervicalgia.
3.  Cervical disc disorder with myelopathy, unspecified cervical region.
4.  Low back pain.
5.  Other intervertebral disc displacement, lumbosacral region.
6.  Myositis, unspecified.
7.  Joint derangement, unspecified.
8.  Pain in left shoulder.  Strain of muscle/tendon of the rotator cuff right shoulder, initial encounter.

Almonte, Lucia                                                                                    17

Disability: Marked disability 75-99%.

09/10/18 Nasar Shahid, M.D.: Procedure Note

Procedure: Trigger point injection, 3rd cervical, bilateral.

09/15/18 Nasar Shahid, M.D.: Procedure Note

Pre-Op Dx:   Lumbar radiculopathy, lumbar HNP.

Post-Op Dx:  [None given.]

Procedure:   Lumbar caudal epidural steroid injection under fluoroscopic
guidance.

11/08/18 Faguna Patel, D.O.: Pain Management Evaluation

Diagnoses:
1.  Bilateral shoulder pain, status post motor vehicle accident.
2.  Cervical radiculopathy.
3.  Lumbar radiculopathy.

Recommendation:
1.  She has completed over 3–4 months of physical therapy, chiropractic care,
    and epidural steroid injections with no relief.  I will refer her to spine surgeon
    for further evaluation and treatment.
2.  She continues to see an orthopedic surgeon in regard to bilateral shoulder
    pain.  She will continue with his treating surgeon.
3.  Activity modifications reviewed with the patient.
4.  She may continue to work, 0% disability.
5.  Follow-up evaluation in 4-6 weeks.

Causality: If history is correct and there is a causal relationship.

11/26/18 Alexandre De Moura, M.D.: Orthopedic Evaluation

The patient presents with a chief complaint of neck and lower back pain.  The
patient is also stating of headaches since the accident.  The patient is also
having a left upper extremity radiculopathy.

Based on this clinical evaluation, the current problem is causally related to this
accident.
Prognosis: Guarded.

12/14/18 Moiz Manaqibwala, M.D.: Orthopedic Evaluation

Almonte, Lucia                                                                                                                   18

Assessment/Plan:
Impingement syndrome of both shoulders.  Discussed pain appears to be more
likely from cervical pathology.  May consider repeat injection to shoulder and/or
arthroscopic NSAID, but given no relief from first injections, outcome is uncertain.

02/21/19 Alan Greenfield, M.D.: Imaging Report

MRI cervical: Straightening of cervical lordosis.  Shallow central disc protrusion at
C3-C4 indents the dural sac.  Bulging disc at C4-C5 with flattening of the dural
sac, approximating the medial aspect of both neural foramina at this level, left
greater than right.  Bulging disc with broad-based central disc herniation at C5-
C6, deforming the dural sac, with relative narrowing of the left neural foreman
compared to the right side at this level.  Bulging disc and spondylosis at C6-C7,
with left-sided broad-based disc herniation deforming the dural sac, where
relative narrowing of the left neural foreman is seen compared to the right side.

02/26/19 Alexandre De Moura, M.D.: Operative Report

Pre-Op Dx:   Cervical radiculopathy.

Post-Op Dx:  Cervical radiculopathy with herniated nucleus pulposus.

Procedure:   1.  Anterior cervical discectomy C6-C7.
             2.  Arthrodesis C6-C7.
             3.  Anterior cervical instrumentation.
             4.  Structural allograft.
             5.  Fluoroscopy used.

03/07/19 Adam Landskowsky, M.D.: Imaging Report

X-ray cervical: Mild reversal of the normal cervical lordosis.  C6-C7 discectomy
and anterior fusion.  C4-C5, C5-C6, and C7-T1 slight anterolisthesis.  Minimal
posterior facet arthrosis.

03/14/19 Moiz Manaqibwala, M.D.: Orthopedic Follow-up

Procedure: Bilateral subacromial cortisone injections today with mild to
moderate pain relief.

03/23/19 Kurt Dischner, M.D.: Emergency Department Record

Diagnoses:
1.  Anxiety, unspecified etiology.
2.  Elevated alkaline phosphatase level.
3.  Elevated blood pressure reading.

Almonte, Lucia                                                                                    19

03/23/19 Benjamin Yam, M.D.: Imaging Report

    X-ray neck: No acute abnormality seen.  Status post anterior cervical fusion.

03/27/19 Mridul Kumar, M.D.: Emergency Department Record

    Diagnoses:
    1.  Elevated blood pressure without diagnosis of hypertension.
    2.  Palpitations.

04/08/19 Chris Moros, D.O.: Orthopedic Evaluation

    Impression:
    1.  Right shoulder impingement syndrome.
    2.  Tendinitis.
    3.  Partial rotator cuff tearing.
    4.  Sprain.

04/18/19 Chris Moros, D.O.: Operative Report

    Pre-Op Dx:  1.  Right shoulder partial rotator cuff tear.
                2.  Right shoulder synovitis.
                3.  Right shoulder impingement.

    Post-Op Dx: 1.  Right shoulder posttraumatic synovitis.
                2.  Right shoulder subacromial impingement.
                3.  Right shoulder partial rotator cuff tear.

    Procedure:  1.  Right shoulder arthroscopic rotator cuff debridement.
                2.  Right shoulder arthroscopic synovectomy.
                3.  Right shoulder arthroscopic decompression with acromioplasty.

05/17/19 Adam Landskowsky, M.D.: Imaging Report

    X-ray cervical: Minimal reversal of the normal cervical lordosis.  C6-C7
    discectomy and anterior fusion.  C4-C5, C5-C6 and C7-T1 slight anterolisthesis.
    Mild posterior facet arthrosis.

05/31/19 Joseph Gregorace, D.O.: Pain Management Follow-up

    Diagnoses:
    1.  Status post ACDF C6-C7 level 02/26/19.
    2.  Myofascitis, bilateral upper trapezius muscles.
    3.  Lumbar spine spasms, HNP L4-L5
    4.  Status post right shoulder arthroscopy 04/18/19.

Almonte, Lucia                                                                                      20

Recommendation:
1. This patient is recommended to follow up with Dr. De Moura for neck and back injuries.
2. She is recommended to follow-up with Dr. Moros for her right shoulder.
3. The patient will continue rehabilitation medicine treatments.
4. I did discuss with her regarding epidural spinal steroid injections.  She defers.
5. She is recommended to refrain from returning to work.

08/16/19 Adam Landskowsky, M.D.: Imaging Report

X-ray cervical: Straightening of the normal cervical lordosis.  C6-C7 discectomy and anterior fusion.  C7-T1 slight anterolisthesis.  Mild posterior facet arthrosis.

11/15/19 Adam Landskowsky, M.D.: Imaging Report

X-ray cervical: Straightening of the normal cervical lordosis.  Stable C6-C7 discectomy and anterior fusion.  C7-T1 slight anterolisthesis.  Mild posterior facet arthrosis.

11/18/19 Alan Greenfield, M.D.: Imaging Report

MRI lumbar: There are underlying disc bulges at L3-L4, L4-L5, and L5-S1, resulting in flattening of the dural sac as outlined above.  There are coexistent left greater than right foraminal disc herniations at L4-L5, with left greater than right neural foraminal encroachment.  Multilevel spondylosis and facet arthropathy as outlined above, with the facet changes greatest from L3-S1.

12/04/19 Timothy Roberts, M.D.: Orthopedic Evaluation

Assessment: … Status post ACDF C6-C7 on 02/26/19 improved from prior to surgery with worsening low back pain to the left.  Cervicalgia.  Fusion of spine cervical region.

12/12/19 Angel Macagno, M.D.: Orthopedic Evaluation

Diagnosis: Cervicalgia.

12/27/19 John Ventrudo, M.D.: Pain Management Evaluation

Diagnoses:
1. Sciatica, unspecified side.
2. Low back pain.
3. Sacrococcygeal disorder, not elsewhere classified.
4. Spinal instabilities, lumbosacral region.

Procedure:    Sacroiliac joint injection with fluoroscopy.

Almonte, Lucia                                                                                    21


01/02/20 Angel Macagno, M.D.: Orthopedic Progress Note

> Discussion: Based on the clinical evaluation, the current problem is causally
> related to this accident.
> Prognosis: Guarded.
> Patient is temporarily totally disabled.
> Activities of treatment discussed in detail with patient, including activity
> modifications, physical therapy, medications, epidural injections and surgery.
> The patient's symptoms continued to worsen and she is not responding at all to
> conservative treatment, patient wants to discuss surgical options.
> She is a candidate for posterior spinal fusion instrumentation L4-L5, possible L3-
> L4, C4, possible laminectomy.

02/20/20 Edwin Richter III, M.D.: Physiatric Evaluation

> Impressions: Ms. Almonte is status post-accident as described above in which
> she sustained injuries and impairments including cervical and lumbar disc
> derangements with associated radiculopathies as well as internal derangements
> of right shoulder. She has chronic pain, decreased range of motion, decreased
> sensation and decreased activity tolerance as a result of her injuries. She is
> expected to have progression of post-traumatic arthritis as result of her injuries.
> She is expected to have progression of adjacent level syndrome as a result of
> her injuries. These injuries are permanent and result from the accident of
> 4/18/18. There is anticipated need of continued medical care (across the life
> span) as a result of this accident. This will include on average visits with spine
> specialists 2–3/year ($155/visit). This will include on average visits with
> musculoskeletal/pain specialists 3–6/year ($155/visit). There is anticipated need
> of future courses of physical therapy with an average of 12–18 sessions per year
> ($130/session). There is anticipated need of continued medical regimen at least
> comparable to ibuprofen ($20/month) and cyclobenzaprine ($20/month).
> Bending or twisting of cervical or lumbar spine should be avoided. Repetitive
> motions of right shoulder should be avoided. Prolonged sitting, standing or
> walking should be avoided. There is anticipated need of follow-up MRI of lumbar
> spine ($1,600) every 2–3 years, follow-up x-ray of lumbar spine ($300) every 2–3
> years and follow-up lower extremity EMG ($1,500) every 2–3 years. There is
> anticipated need for lumbar spine fusion surgery ($75,000 to $125,000) within 2–
> 3 years. There is anticipated need of follow-up MRI of cervical spine ($1,600)
> every 2–3 years, follow-up x-ray of cervical spine ($300) every 2–3 years and
> follow-up upper extremity EMG ($1,500) every 2–3 years. There is anticipated
> need for additional cervical spine fusion surgery ($75,000 to $125,000) within
> 10–15 years. There is anticipated need of follow-up MRI of right shoulder
> ($1,600) every 3–5 years. She is not expected to be able to successfully
> maintain employment at any work for which she is qualified beyond 10–15 years
> from now.

Almonte, Lucia                                                                                           22

03/02/20 Angel Macagno, M.D.: Operative Report

Pre-op Dx:   Disk compromise at L4-L5, disk herniation L4-L5, unstable
             retrolisthesis mechanical lower back, radiculopathy.

Post-op Dx:  [Same.]

Operation:   1. Application of intervertebral biomechanical device L4-L5 (Life
             Spine Expandable Spacer).
             2. Partial corpectomy and discectomy L4-L5.
             3. Segmental fixation L4-L5 (Threshold System – Spineology).
             4. Posterior and posterolateral technique arthrodesis right lateral
             transverse technique L4-L5.
             5. Laminectomy L4-L5 with decompression nerve root including
             foraminotomy, facetectomy, disc excision right L4-L5.
             6. Aspiration of iliac crest bone marrow bilateral with stem cell
             concentration and reimplantation.
             7. Allograft morselized.
             8. Autograft morselized.
             9. Fluoroscopy interpretation.

**Conclusion(s) from Medical Records:**

Based on the medical records, Ms. Almonte has significant physical functional
impairments that impact her employability and functional abilities to perform work.  On
January 2, 2020, treating physician Dr. Angel Macagno composed an orthopedic
progress note that stated, "Discussion: Based on the clinical evaluation, the current
problem is causally related to this accident.  Prognosis: Guarded.  Patient is temporarily
totally disabled.  Activities of treatment discussed in detail with patient, including activity
modifications, physical therapy, medications, epidural injections and surgery.   The
patient's symptoms continued to worsen and she is not responding at all to conservative
treatment, patient wants to discuss surgical options.  She is a candidate for posterior
spinal fusion instrumentation L4-L5, possible L3-L4, C4, possible laminectomy." On
February 20, 2020, Dr. Edwin Richter, III, stated that Ms. Almonte "is not expected to be
able to successfully maintain employment at any work for which she is qualified beyond
10–15 years from now."  Based on the medical records reviewed for this evaluation, Ms.
Almonte was assessed at the sedentary level.

## SELF-REPORT

Ms. Almonte currently reports that she suffers from daily chronic pain in her neck, upper
back, mid back, low back, and legs to toes.  Ms. Almonte rated her pain on the following
pain scale:

Almonte, Lucia                                                                                          23

| Pain Level | Description |
|------------|-------------|
| 0 | No pain |
| 1 | Mild pain; you're aware of it, but it doesn't bother you |
| 2 | Moderate pain; tolerable without medications |
| 3 | Moderate pain; requires medication to tolerate |
| 4–5 | More severe pain; you begin to feel antisocial |
| 6 | Severe pain |
| 7–9 | Intensely severe pain |
| 10 | Most severe pain; unbearable |

| Area | Frequency | Pain Intensity |
|------|-----------|----------------|
| Neck | Constant | 2 to 6 |
| Upper Back | Constant | 6 to 7 |
| Mid Back | Constant | 3 (constant) |
| Low Back | Constant | 7 to 10 |
| Legs to Toes | Constant | 6 to 7 |

Ms. Almonte indicated that her abilities for lifting, sitting, climbing, balancing, stooping, driving, feeling, reaching, standing, walking, bending, kneeling, and sleeping are impaired as a result of her injury.  Ms. Almonte noted the following specific limitations:

| Activity | Functional Ability |
|----------|--------------------|
| Lifting | 10 lbs. at most |
| Sitting | 60 minutes at the most, then takes a break |
| Climbing | Uses hand rail, takes longer ascending now |
| Balancing | Worse now |
| Stooping | Needs a third point of contact, difficult |
| Driving | Local driving, usually 20 to 25 minutes |
| Feeling | Right hand numbness |
| Reaching | Overhead reaching is problematic for right shoulder |
| Standing | Needs to take a break after 20 minutes |
| Walking | 30 to 35 minutes at the most |
| Bending | Causes pain in low back |
| Kneeling | Needs a third point of contact, difficult |
| Sleeping | Disrupted, wakes up 3x/average night |

Ms. Almonte takes medications as follows:

| Medication | Purpose | Frequency |
|------------|---------|-----------|
| Acetaminophen | OTC Analgesic | 500mg 3x/Day |
| Lidocaine Patches | Topical Anesthetic | 3–4x/Week (night) |
| Lidocaine Cream | Topical Anesthetic | 1x/Day |

Ms. Almonte reported that she is being treated by the following physician on a regular basis:

Almonte, Lucia                                                                                    24

| Physician | Specialty | Frequency |
|---|---|---|
| Dr. Angel Macagno | Ortho: L Spine | 1x/Month |

## VOCATIONAL TESTING

During the course of our interview, Ms. Almonte was administered three tests to help ascertain vocational trait and interest factors. The tests measure factors that correspond to the U.S. Department of Labor (DOL) worker trait factor system used to categorize jobs and to compare worker aptitudes to job requirements. These tests are as follows:

| Test | Department of Labor – Related Trait Factors |
|---|---|
| Wonderlic Personnel Test | Reasoning (R), Mathematics, (M), Language (L) |
| Wide Range Achievement Test V | Reasoning (R), Mathematics, (M), Language (L), Clerical Perception (Q) |
| Self-directed Search | Career Guidance/Interest Factors |

Test results for Ms. Almonte are as follows:

### Wonderlic Personnel Test (Form IV – Spanish Version):

The Wonderlic Personnel Test is a test of general intelligence. Ms. Almonte's score was as follows:

| | |
|---|---|
| Raw Score: | 9 |
| Adjusted Raw Score | 10 |
| Grade Equivalent: | 7–8 Years of Education |
| Cumulative Percentile Rank: | 6.06% (Adult Working Population Norms) |
| WAIS Equivalent: | 80 Full Scale IQ (Norm = 100) |

The test results were in the Very Low range for Ms. Almonte's age group. A score of 10 on the Wonderlic Personnel Test is common for individuals with 7 to 8 years of education. The job potential for individuals who score in this range includes furniture repair, simple carpentry, electrician helper and domestic work. The lowest 13% of the working population score within this range (under 12). As a group they are unlikely to benefit from formalized training settings and are successful using simple tools under consistent supervision. [6]

### Wide Range Achievement Test, Revision 5 (WRAT-V):

The WRAT-V has subtests for Word Reading, Sentence Comprehension, Spelling, Math Computation, and Reading Composite (for the purposes of this evaluation, the subtest

---

[6] **Wonderlic Personnel Test & Scholastic Level Exam,** 1992, Wonderlic Personnel Test, Inc., Libertyville, IL.

**Kincaid Wolstein Vocational and Rehabilitation Services**
One University Plaza, Suite 302, Hackensack, New Jersey 07601
www.KWVRS.com ■ Tel: (201) 343-0700 ■ Fax: (201) 343-0757

Almonte, Lucia                                                                                     25

for Spelling was not administered).  This is a test of achievement and learning ability and can be compared to achievement levels of other individuals in the same age group. Her scores were as follows:

| Subtest | Standard Score | Percentile | Grade Score |
|---|---|---|---|
| Word Reading | 72 | 3 | 4.7 |
| Math Computation | 80 | 9 | 4.3 |
| Sentence Comprehension | 70 | 2 | 3.7 |
| Reading Composite | 69 | 2 | --- |

Ms. Almonte's scores were in the Very Low range for Word Reading, Math Computation, and Sentence Comprehension, and in the Extremely Low range for Reading Composite, indicating inadequate abilities in all domains for most jobs.

### Self-directed Search Form E, 4th Edition (Spanish Version):

The Self-directed Search provides a measure of an individual's vocational interests and is helpful in job-person matching.  Test scores for Ms. Almonte were as follows:

| Scale: | Score: |
|---|---|
| Realistic | 16 |
| Investigative | 32 |
| Artistic | 37 |
| Social | 38 |
| Enterprising | 37 |
| Conventional | 37 |

Ms. Almonte had highest scores on the Social, Artistic, Enterprising, and Conventional Scales.  A high Social score indicates interest in educational and social welfare occupations.   Individuals with high Artistic scores have interests in artistic, musical, and literary occupations.  A high Enterprising score indicates interest in managerial and sales occupations.  Individuals with high Conventional scores have interests in office and clerical occupations.

Following are examples of occupations that resemble Ms. Almonte's response pattern:

| D.O.T No. | Occupational Title |
|---|---|
| 359.673-010 | Chauffeur |
| 238.367-010 | Gate Agent |
| 290.477-018 | Sales Clerk, Food |
| 245.367-010 | Animal Hospital Clerk |
| 295.357-010 | Apparel-Rental Clerk |
| 205.367-018 | Claims Clerk |
| 299.367-010 | Customer Service Clerk |
| 290.477-018 | Sales Clerk, Food |
| 099.223-010 | Driving instructor |

Almonte, Lucia                                                                      26

> 319.677-010     Caterer Helper

The examples provided are representative of Ms. Almonte's response pattern and are intended to illustrate the job positions that are consistent with her vocational preferences. They are not necessarily intended to represent viable post-injury vocational options for Ms. Almonte, since they may or may not be compatible with the physical functional limitations with which she presents.

### Conclusion(s) from Vocational Testing:

Ms. Almonte's score on the academic instruments of the vocational test battery (WRAT-V and Wonderlic Personnel Test) spanned from the 2nd percentile up to the 9th percentile, which is reflective of her limited educational attainment and is consistent with her pre-injury employment history in manual labor occupations. Based on these scores, Ms. Almonte would be more suitable for on-the-job or short-duration job retraining. Her answers on the Self-directed Search matched an assortment of occupations that could and likely would, if needed, be relevant for future job search and career exploration activities.

### POST-INJURY VOCATIONAL PROFILE

The profile developed from the education and employment experience was adjusted to reflect the functional limitations that Ms. Almonte currently demonstrates, as derived from the records reviewed and generated for this evaluation.

Ms. Almonte's Post-Injury Vocational Profile is comprised of multiple factors: education, employment experience, vocational testing, medical records, and Ms. Almonte's self-report. The information relevant to her vocational situation is as follows:

- Education:
  - Ms. Almonte did not obtain a high school equivalency.
- Employment:
  - Pre-Injury: Medium Physical Demands.
  - Post-Injury: Sedentary Physical Demands.
- Vocational Testing:
  - Ms. Almonte would be suitable for on-the-job or short-duration job retraining.
- Medical Records:
  - Ms. Almonte was assessed at the sedentary level.
- Ms. Almonte's self-reported limitations are noted and considered. For the purposes of determining her residual abilities, the medical records are relied upon.

Based on the medical records, Ms. Almonte was limited to sedentary work. For the sedentary profile, this would preclude her from activities involving light, medium, and heavier physical exertion, and reduce her capacity for lifting, carrying, pushing, pulling,

**Kincaid Wolstein Vocational and Rehabilitation Services**
One University Plaza, Suite 302, Hackensack, New Jersey 07601
www.KWVRS.com ∎ Tel: (201) 343-0700 ∎ Fax: (201) 343-0757

Almonte, Lucia                                                                    27

standing, and walking.  Her capacity for seeing was increased from occasional to frequent.  The remainder of the pre-injury profile was held constant.

According to the **Dictionary of Occupational Titles**, sedentary work is defined as follows:

> Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are Sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

### TRANSFERABLE SKILLS ANALYSIS

Labor market area and availability of jobs in a specific labor market must be considered, since certain occupations and professions are concentrated in various geographic regions.  According to Field, placeability exists when "economic conditions and employer attitudes are such that a person can actually be placed in a job."[7]

Both the pre-injury profile of worker traits and the post-injury profile for Ms. Almonte were compared to all 12,775 jobs in the D.O.T., interfaced with a labor market survey of the most frequently hired for jobs in the State of New York, 2020.  This was done, as noted, using the **McCroskey Transferable Skills Program**, which matches and compares worker capacities against the demands of jobs to determine where the two intersect.  The program has proven over time, through continually published, peer-reviewed research, to have a high degree of validity and reliability for measuring probable outcomes and entry point wages.

Pre-injury, Ms. Almonte's profile matched 48 of the 1,258 most frequently hired for jobs statewide, or about 4% of this job database using the MTSP program.  This is reflective of her prior employment experience in House Cleaner, Secretary, Hostess, Retail Worker, Sales Clerk, and Cashier job positions.  It also indicates that she had the **capacity** to perform, or to learn to perform, these jobs.  The numbers of matching pre-impairment and post-impairment jobs for each of the 10 categories of work in the D.O.T. are indicated in **Table 1** below.

---

[7] Field, op. Cit., pl-12

**Kincaid Wolstein Vocational and Rehabilitation Services**
One University Plaza, Suite 302, Hackensack, New Jersey 07601
www.KWVRS.com ■ Tel: (201) 343-0700 ■ Fax: (201) 343-0757

Almonte, Lucia                                                                                                28

## TABLE 1
### Pre-impairment & Post-impairment Job Matches
### (By Job Category)

| No. of Job Categories | Pre-impairment No. of Jobs | Post-impairment No. of Jobs |
|---|---|---|
| 0 Professional | 0 | 0 |
| 1 Technical | 1 | 0 |
| 2 Clerical/Sales | 24 | 10 |
| 3 Service | 19 | 1 |
| 4 Agriculture | 0 | 0 |
| 5 Processing | 1 | 0 |
| 6 Machine Trades | 0 | 0 |
| 7 Bench Work | 1 | 0 |
| 8 Structural | 1 | 0 |
| 9 Miscellaneous | 1 | 0 |
| **Total** | **48** | **11** |

Jobs with transferable skills are indicated in **Table 2**.

## TABLE 2
### Pre-impairment & Post-impairment Job Transferability
### (Number of Jobs by Level of Transferable Job Skills)

| Category | Pre-impairment | Post-impairment |
|---|---|---|
| Moderate to high skill transferability | 10 | 3 |
| Job transferability requiring little or no transferable skills | 38 | 8 |

Post-injury at the sedentary level, with her functional limitations as well as her residual functional capacities, Ms. Almonte's profile matched 11 of the most frequently hired for jobs in the State of New York.  This is indicative of a 77% diminution of personal access to the local labor market, pre- vs. post-injury, based solely upon the trait-factor job matching analysis.  Three of the jobs were in a transferable skills category for which moderate to high levels of transferable skills were available.  Examples of the matching job titles are as follows:

| D.O.T. Code | Job Title |
|---|---|
| 237.367-038 | Receptionist |
| 237.367-010 | Appointment Clerk |
| 237.367-042 | Referral and Information Aide |
| 239.367-014 | Dispatcher, Maintenance Service |
| 249.367-010 | Animal Shelter Clerk |
| 221.367-070 | Service Clerk |
| 379.367-010 | Surveillance System Monitor |

Almonte, Lucia                                                                    29

209.687-018          Reviewer

According to Wolstein (2016), the occupation of Surveillance-System Monitor has changed substantially and this job match would likely exceed sedentary unskilled job duties.[8]

The results of the transferable skills analysis, based upon her educational level and work history, are consistent with diminished physical capacities at the sedentary level (with adjustments as noted).  A copy of the report is attached as an addendum to this narrative (see Appendix A).

### Conclusion(s) from Transferable Skills Analysis:

The results of the transferable skills analysis indicate that, based solely on the trait-factor system, Ms. Almonte's sedentary post-injury profile matched 11 occupations, a diminution of 77% compared to the 48 occupational titles contained in her pre-injury profile.

## ANALYSIS OF EMPLOYABILITY

Technically, employability is a status that "exists if a person possesses skills, abilities, and traits necessary to perform a job or jobs."[9]  According to McCroskey, employability theoretically exists when "worker capacity equals or exceeds the demands of a job."[10] When an individual's capacities, experiences, and skills are equal to or greater than the demands of a job, the person has the **capacity** to perform the job or learn to perform the job.  Employability is solely a measure of individual capacity measured against job demands.  While interests associated with jobs are indicators of preference, not capacity, they nevertheless provide signals as to what types of work and environment an individual prefers.

Ms. Almonte's employability is influenced by and dependent upon a synthesis of factors. In Ms. Almonte's case, the following factors are pertinent:

- Physical functional capacities and limitations;
- Transferability of previously developed vocational skills;
- Academic abilities for job retraining;
- Candidacy for vocational rehabilitation services.

**Physical functional capacities and limitations:**
The medical records reviewed for this evaluation indicate that Ms. Almonte has physical functional impairments and ongoing treatment needs (Dr. Angel Macagno, January 2,

---

[8] Wolstein, D. (2016).  Surveillance-system Monitors in the Work Force.  *Journal of Forensic Vocational Analysis.* 16(2).

[9] Field, T., 1993. **Strategies for the Rehabilitation Consultant**, p. I-7, Elliott & Fitzpatrick, Inc., Athens, GA.

[10] McCroskey, B.J., 1994.  **Manual for the McCroskey Transferable Skills Program**, Expert Vocationologist Edition, Ver. 7., Vocationology, Inc., Minneapolis, MN.

Almonte, Lucia                                                                                      30

2020).  She was initially treated with conservative care (emergency department treatment; medical imaging of the chest, brain, cervical spine, lumbar spine, left shoulder, and right shoulder; a chiropractic evaluation; a comprehensive evaluation; an orthopedic evaluation; and an electrodiagnostic study) followed by surgical intervention and invasive procedures as follows:

- Cervical trigger point injection: Dr. Nasar Shahid (08/06/18).
- Lumbar transforaminal epidural injection: Dr. Nasar Shahid (08/18/18).
- Trigger point injection: Dr. Nasar Shahid (09/10/18).
- Lumbar caudal epidural injection: Dr. Nasar Shahid (09/15/18).
- Anterior cervical discectomy: Dr. Alexandre De Moura (02/26/19).
- Right shoulder arthroscopic synovectomy: Dr. Chris Moros (04/18/19).
- Sacroiliac joint injection: Dr. John Ventrudo (12/27/19).
- Biomechanical device and arthrodesis: Dr. Angel Macagno (03/02/20).

On January 2, 2020, Dr. Angel Macagno composed an orthopedic progress note that set forth:

> Discussion: Based on the clinical evaluation, the current problem is causally related to this accident.
> Prognosis: Guarded.
> Patient is temporarily totally disabled.
> Activities of treatment discussed in detail with patient, including activity modifications, physical therapy, medications, epidural injections and surgery.
> The patient's symptoms continued to worsen and she is not responding at all to conservative treatment, patient wants to discuss surgical options.
> She is a candidate for posterior spinal fusion instrumentation L4-L5, possible L3-L4, C4, possible laminectomy.

On February 20, 2020, Dr. Edwin Richter, III, composed a narrative report that averred:

> Repetitive motions of right shoulder should be avoided.  Prolonged sitting, standing or walking should be avoided.  There is anticipated need of follow-up MRI of lumbar spine ($1,600) every 2–3 years, follow-up x-ray of lumbar spine ($300) every 2–3 years and follow-up lower extremity EMG ($1,500) every 2–3 years.  There is anticipated need for lumbar spine fusion surgery ($75,000 to $125,000) within 2–3 years.  There is anticipated need of follow-up MRI of cervical spine ($1,600) every 2–3 years, follow-up x-ray of cervical spine ($300) every 2–3 years and follow-up upper extremity EMG ($1,500) every 2–3 years.  There is anticipated need for additional cervical spine fusion surgery ($75,000 to $125,000) within 10–15 years.  There is anticipated need of follow-up MRI of right shoulder ($1,600) every 3–5 years.  She is not expected to be able to successfully maintain employment at any work for which she is qualified beyond 10–15 years from now.

Based on the medical records reviewed for this evaluation, Ms. Almonte was assessed

Almonte, Lucia                                                                                    31

at the sedentary level, consistent with her current employment.  If she becomes unsuitable for sedentary work, based on the opinion of Dr. Edwin Richter, III, Ms. Almonte will be precluded from labor force activities.

**Transferability of previously developed vocational skills:**
Ms. Almonte's physical functional capacities and limitations have a direct impact on the transferability of her previously developed vocational skills.  Accordingly, at the sedentary level, her post-injury profile matched 11 occupations, which is a 77% diminution of personal access to the competitive labor market.

**Academic abilities for retraining:**
Ms. Almonte's academic abilities for job retraining are best represented by her past educational attainment, in conjunction with her results on the vocational test battery. She entered but never completed the 12th grade and her vocational testing results spanned from the 2nd percentile up to the 9th percentile.

In the past, Ms. Almonte was able to avoid vocational barriers constituted by her limited academic abilities.  Due to the physical limitations with which she presents, this is no longer a viable strategy for Ms. Almonte.

Ms. Almonte is also an English as a Second Language speaker.  She can take English classes to improve her general ability to benefit from training.  Based on the factors above, she would be most suitable for on-the-job or short-duration job retraining, if needed in the future.

**Candidacy for vocational rehabilitation services:**
Ms. Almonte's ability to benefit from vocational rehabilitation services is a function of all of the factors discussed above.  The viability of these resources will be discussed in the Vocational Rehabilitation section below.

***Conclusion(s) from Analysis of Employability:***

Considering the physical functional capacities and limitations derived from the medical records reviewed for this evaluation, the diminution of transferable skills yielded by the transferable skills analysis, and the very low to extremely low academic abilities obtained from the results of the vocational test battery, it is within a reasonable degree of vocational certainty that Ms. Almonte is unemployable in her customary capacity as a House Cleaner but has been able to maintain her work as a Secretary.  According to Dr. Richter, III, she will not be able to maintain this work beyond 10-15 years.  If she is not a candidate for sedentary work, Ms. Almonte will be precluded from labor force activities.

## VOCATIONAL REHABILITATION

Ms. Almonte is 39 years old and is alleging that, as a consequence of injuries sustained in a motor vehicle accident, she has physical functional limitations that hinder him from continuing her former occupation as a House Cleaner.  The purpose of vocational

Almonte, Lucia                                                                                    32

rehabilitation is to provide training and other services when there is reasonable probability of the individual returning to gainful employment.  Usually this includes provision of educational training, on-the-job training, medical evaluation if indicated, job placement assistance, assistive technologies, and related services.

Ms. Almonte's diminished physical functional capacities are incompatible with her work history as a House Cleaner, but she has returned to work in a reduced capacity as a Secretary.  She does not require vocational rehabilitation services at this time.

The vocational rehabilitation process has five phases in order of preference.  Vocational rehabilitation clients receive services for the phase best suited to their specific needs:

- *Phase One*:  The vocational rehabilitation counselor assists the worker to return to the same job with the pre-impairment employer.  Interventions at this phase may include programs of physical conditioning or work-hardening, graduated return to work, work evaluation, and refresher training or skill upgrading.

- *Phase Two*:  If it is determined the worker cannot return to the same job, the vocational rehabilitation counselor encourages and works with the pre-impairment employer to make worksite accommodations and job modification, or to provide alternative in-service placement.

- *Phase Three*:  If the employer is unable or unwilling to accommodate the worker, the vocational rehabilitation counselor identifies suitable occupational options in the same or related industry.

- *Phase Four*:  If the worker is unable to return to alternative employment in the same or related industry, the vocational rehabilitation counselor explores opportunities in all industries, with emphasis placed on the worker's transferable skills, aptitudes, and interests.

- *Phase Five*:  If existing skills are insufficient to return the worker to suitable employment, the vocational rehabilitation counselor uses training programs to enable the worker to acquire new occupational skills.  In addition, the vocational rehabilitation counselor assists the worker to secure employment once the training is complete.

In Ms. Almonte's case, it is my opinion that she would be suitable for Phase Four rehabilitation services (based on the transferable skills analysis) to Phase Five rehabilitation services (based on the vocational testing results and her past educational attainment).

Vocational rehabilitation services are available through the Nassau County office of the New York State Adult Career and Continuing Education Services – Vocational Rehabilitation (ACCES-VR).  There is no cost for meeting with an ACCES-VR counselor or for anything that is needed to determine if ACCES-VR can help an individual (this

would include medical examination, vocational testing, and other assessments).  There is also no cost for job placement services.  Other services may be based upon a person's income and/or family resources.

### Assistive Technology

Individuals with disabilities can benefit from the application of technology to overcome the barriers that interfere with their functioning in a work environment.  According to PL 100-407,[11] assistive technology has been defined as follows:

> Any item, piece of equipment or product system whether acquired commercially off the shelf, modified, or customized that is used to increase or improve functional capacities of individuals with disabilities.

Ms. Almonte reported that she was experiencing functional limitations in the areas of lifting, sitting, climbing, balancing, stooping, driving, feeling, reaching, standing, walking, bending, kneeling, and sleeping.  The following items of assistive technology (AT) would likely be of benefit to her daily functioning:

| Functional Limitation | AT Currently Used | AT Options |
|---|---|---|
| Bending/Kneeling/Stooping | None | Reacher/Grabber Ergonomic Desk/Work Area |
| Reaching | None | Reacher/Grabber Ergonomic Desk/Work Area |
| Sitting | None | Back Support Pillow Ergonomic Chair |
| Ambulation | None | Canes/Walkers Electric Scooters Wheelchairs |
| Climbing/Physical Access | None | Chair Lifts Elevator Ramp |
| Driving/Use of Foot Controls | None | Hand Controls Driving Aids Switches |
| Manual Dexterity | None | Adaptive Tools Ergonomic Keyboards |
| Hand Strength | None | Gripping Aids Adaptive Utensils |
| Standing | None | Sit/Stand Stool Adjustable Table |
| Sleeping | None | Motorized Bed Frame |

---

[11] United States Congress: PL 100-407, **The Technology Related Assistance for Individuals with Disabilities Act of 1988.**

**Kincaid Wolstein Vocational and Rehabilitation Services**
One University Plaza, Suite 302, Hackensack, New Jersey 07601
www.KWVRS.com ▪ Tel: (201) 343-0700 ▪ Fax: (201) 343-0757

Almonte, Lucia                                                                  34

| | | Adjustable Mattress |
|---|---|---|

Bending/Kneeling/Stooping:  Ms. Almonte reported that she has difficulty with and experiences pain from bending, kneeling, and stooping.  There are hand-operated reachers that extend a person's range for reaching and retrieving objects, and that reduce the need to bend, kneel, or stoop.  In addition, specially-designed desks and work areas place materials and tools within easy reach for use by a person with limited range of motion.

Reaching:  Ms. Almonte stated that she has difficulty reaching overhead due to her right shoulder.  Again, there are hand-operated reachers that extend a person's range for reaching and retrieving objects.  In addition, specially-designed desks and work areas place materials and tools within easy reach for a person with limited range of motion.

Sitting:  Ms. Almonte indicated that sitting for extended periods is difficult, usually longer than 30 minutes.  Back support pillows and specially-designed ergonomic chairs with multiple adjustments for height, firmness, and tilt angle can alleviate discomfort and extend sitting time.

Ambulation:  Ms. Almonte currently does not use any devices to assist her in walking but reported that she will be using a cane after surgery.  If her ability to ambulate is further impaired, there are a variety of walkers, electric scooters, and wheelchairs that individuals with mobility impairments use to ambulate.  In a home or public setting, these could be used to get to a location and move about during the course of activities.

Climbing/Physical Access:  Ms. Almonte can use her cane (after surgery) and handrails to assist him in climbing steps.  Other options are a ramp, chair lift, or elevator that could carry him from one level to another.

Driving/Use of Foot Controls:  Ms. Almonte noted that she drives locally.  There are alternative hand controls for motor vehicles that can circumvent the need to operate foot pedals.  Driving aids such as blind-spot mirrors and rear-view cameras are also available, which can reduce the need to adjust physically in order to achieve better viewing angles while operating vehicles.

Manual Dexterity & Hand Strength:  Ms. Almonte indicated that she has difficulty gripping and grasping (feeling) due to right hand numbness.  She does not currently use any aids or equipment to assist with her daily activities.  There is a wide variety of low-cost adaptive aids and tools to enhance existing hand strength and finger dexterity for individuals experiencing impairments of this nature.

Standing:  Ms. Almonte does not use any assistive devices to help him when standing.  She may benefit from sit/stand tools and adjustable tables that would allow him to change positions from sitting to standing as needed.

Sleeping:  Ms. Almonte stated that her sleep cycle has been disrupted.  Motorized bed

Almonte, Lucia                                                                              35

frames are available to enable postural changes when going to sleep. Adjustable mattresses are also available to help in obtaining a comfortable sleep position. These devices would not be applicable to job sites, but could decrease fatigue or sleep deprivation to improve an individual's vocational functioning.

Assistive technologies could reasonably be expected to improve Ms. Almonte's daily functioning. From a vocational point of view, these devices would not, absent improvement in her medical condition, enable him to sustain competitive work in her customary occupation as a House Cleaner.

### Conclusion(s) from Vocational Rehabilitation:

Ms. Almonte has diminished physical functional capacities and is precluded from continuing her former work as a House Cleaner. She has significantly reduced labor force access at the sedentary level and limited academic abilities for retraining. Ms. Almonte does not require vocational rehabilitation services at this time. She would need to be capable of sedentary work at the least in order to benefit from these services, but according to Dr. Edwin Richter, III, if she is unable to work as a Secretary beyond 10-15 years (a sedentary occupation), Ms. Almonte will not be a candidate for workforce activities.

## ANALYSIS OF EARNINGS/EARNINGS CAPACITY

The power to earn money is a function of the capacity to perform work. The capacity to perform work is predicated upon individual mental and physical abilities that are measurable and quantifiable. This analysis was done in accordance with the worker trait-factor system developed by the U.S. Department of Labor, which provides the means for such measurement.

Ms. Almonte was self-employed as a House Cleaner at the time of her injury. Her Schedule C-EZ, Forms for 2014 to 2018 show the following demonstrated wage earnings:

| Year | Gross Receipts |
|------|----------------|
| 2014 | $16,000 |
| 2015 | $16,500 |
| 2016 | $15,600 |
| 2017 | $15,600 |
| 2018 | $10,400 |

Ms. Almonte has remained at work as a Secretary but was unable to maintain her work as a House Cleaner and sustained a total loss of earnings that she would have generated in this capacity, offset by the temporary wages she earned as a Hostess. Ms. Almonte will continue to sustain lost earnings for the wages she would have generated as a House Cleaner.

Almonte, Lucia                                                                        36

Ms. Almonte's loss of earning capacity is directly related to the severity of her disability. According to the Bureau of Labor Statistics, U.S. Department of Labor, the following labor force characteristics for Persons with a Disability are noted:

> In 2014, 17.1 percent of persons with a disability were employed, the U.S. Bureau of Labor Statistics reported today.  In contrast the employment-population ratio for those without a disability was 64.6 percent.  The ratio for persons with a disability declined by 0.5 percentage point from 2013 to 2014, while the ratio for those with no disability increased by 0.6 percentage point.  The unemployment rate of persons with a disability edged down to 12.5 percent from 2013 to 2014, while the rate for those without a disability declined to 5.9.

> The data on persons with a disability are collected as part of the Current Population Survey (CPS), a monthly sample survey of about 60,000 households that provides statistics on employment and unemployment in the United States. The collection of data on persons with a disability is sponsored by the Department of Labor's Office of Disability Employment Policy.

> - For all age groups, the employment-population ratio was much lower for persons with a disability than for those with no disability.
> - Unemployment rates were higher for persons with a disability than for those with no disability among all educational attainment groups.
> - In 2014, 33 percent of workers with a disability were employed part time, compared with 18 percent for those with no disability.
> - Employed persons with a disability were more likely to be self-employed than those with no disability.[12]

Accordingly, Ms. Almonte's lifetime earnings would likely be reduced further by periods of unemployment, depending on the severity of her disability as she ages.

If a need were identified in the future, Ms. Almonte would be a candidate for vocational rehabilitation services.  Competitiveness increases with the attainment of vocational training.  Even with completion of vocational training, Ms. Almonte's expected entry point annual earnings would likely be lower than her demonstrated wages as a House Cleaner.

The above wage-earnings do not include computation of such variables as wage growth over time, lost promotional opportunities and advancement, the value of fringe benefits, income taxes, present value computation, and other economic factors. The figures do represent an estimate of the diminution of annual gross wage-earning power as a consequence of diminished functional work capacity for Ms. Almonte.  Her future occupational base has also been significantly reduced as a consequence of her disability and resultant functional impairments.

---

[12] U.S. Department of Labor, Bureau of Labor Statistics, **Current Population Survey** USDL-15-1162, Persons with a Disability: Labor Force Characteristics.  Released Tuesday, June 16, 2015.

Almonte, Lucia                                                                 37

### *Conclusion(s) from Analysis of Earnings/Earning Capacity*:

1) Prior to injury, Ms. Almonte was working as a House Cleaner in her local labor market.  She earned up to $16,500 in this capacity.  Post-injury, Ms. Almonte was unable to maintain this line of work and sustained a total loss of earnings for the wages she would have generated in this capacity, temporarily offset by the wages she earned as a Hostess.

2) Ms. Almonte's wage-earning power is currently eliminated for her pre-injury work as a House Cleaner.  She does not require vocational rehabilitation services at this time, and even if she will require them, these services will not restore her ability to return to her previous work as a House Cleaner.

3) As a result of the injuries incurred on April 18, 2018, Ms. Almonte has experienced lost earnings to the present.  She will continue to experience lost earnings that comprise her former wage rate (as a House Cleaner), plus benefits, from the date of her injury through her estimated work life.  Ms. Almonte can continue earning wages as a Secretary.

4) If and when she is unable to maintain her current work in the future, which according to Dr. Edwin Richter, III, will be within 10-15 years, Ms. Almonte will not be a candidate for workforce activities.

### SUMMARY

In summary, based on the results of the vocational evaluation of Ms. Almonte, and considering her age, education, past work experience, and the opinions expressed in the medical records, the following are my opinions within a reasonable degree of vocational certainty regarding Ms. Almonte's employability and earning capacity.

1. Ms. Almonte demonstrated the ability to perform work successfully as a House Cleaner, Secretary, Hostess, Retail Worker, Sales Clerk, and Cashier.  She showed the ability to perform duties, develop skills, and acquire the knowledge and training necessary to obtain and maintain employment in these job positions.

2. Based on the medical records, Ms. Almonte has significant physical functional impairments that impact her employability and functional abilities to perform work.  On January 2, 2020, treating physician Dr. Angel Macagno composed an orthopedic progress note that stated, "Discussion: Based on the clinical evaluation, the current problem is causally related to this accident.  Prognosis: Guarded.  Patient is temporarily totally disabled.  Activities of treatment discussed in detail with patient, including activity modifications, physical therapy, medications, epidural injections and surgery.   The patient's symptoms continued to worsen and she is not responding at all to conservative treatment, patient wants to discuss surgical options.  She is a candidate for posterior spinal fusion

Almonte, Lucia                                                                                        38

instrumentation L4-L5, possible L3-L4, C4, possible laminectomy."  On February 20, 2020, Dr. Edwin Richter, III, stated that Ms. Almonte "is not expected to be able to successfully maintain employment at any work for which she is qualified beyond 10-15 years from now."  Based on the medical records reviewed for this evaluation, Ms. Almonte was assessed at the sedentary level.

3.  Ms. Almonte's score on the academic instruments of the vocational test battery (WRAT-V and Wonderlic Personnel Test) spanned from the 2nd percentile up to the 9th percentile, which is reflective of her limited educational attainment and is consistent with her pre-injury employment history in manual labor occupations.  Based on these scores, Ms. Almonte would be more suitable for on-the-job or short-duration job retraining.  Her answers on the Self-directed Search matched an assortment of occupations that could and likely would, if needed, be relevant for future job search and career exploration activities.

4.  The results of the transferable skills analysis indicate that, based solely on the trait-factor system, Ms. Almonte's sedentary post-injury profile matched 11 occupations, a diminution of 77% compared to the 48 occupational titles contained in her pre-injury profile.

5.  Considering the physical functional capacities and limitations derived from the medical records reviewed for this evaluation, the diminution of transferable skills yielded by the transferable skills analysis, and the very low to extremely low academic abilities obtained from the results of the vocational test battery, it is within a reasonable degree of vocational certainty that Ms. Almonte is unemployable in her customary capacity as a House Cleaner but has been able to maintain her work as a Secretary.  According to Dr. Richter, III, she will not be able to maintain this work beyond 10-15 years.  If she is not a candidate for sedentary work, Ms. Almonte will be precluded from labor force activities.

6.  Ms. Almonte has diminished physical functional capacities and is precluded from continuing her former work as a House Cleaner.  She has significantly reduced labor force access at the sedentary level and limited academic abilities for retraining.  Ms. Almonte does not require vocational rehabilitation services at this time.  She would need to be capable of sedentary work at the least in order to benefit from these services, but according to Dr. Edwin Richter, III, if she is unable to work as a Secretary beyond 10-15 years (a sedentary occupation), Ms. Almonte will not be a candidate for workforce activities.

7.  Prior to injury, Ms. Almonte was working as a House Cleaner in her local labor market.  She earned up to $16,500 in this capacity.  Post-injury, Ms. Almonte was unable to maintain this line of work and sustained a total loss of earnings for the wages she would have generated in this capacity, temporarily offset by the wages she earned as a Hostess.

8.  Ms. Almonte's wage-earning power is currently eliminated for her pre-injury work

Almonte, Lucia                                                                                          39

as a House Cleaner.  She does not require vocational rehabilitation services at this time, and, even if she will require them, these services will not restore her ability to return to her previous work as a House Cleaner.

9.  As a result of the injuries incurred on April 18, 2018, Ms. Almonte has experienced lost earnings to the present.  She will continue to experience lost earnings that comprise her former wage rate (as a House Cleaner), plus benefits, from the date of her injury through her estimated work life.  Ms. Almonte can continue earning wages as a Secretary.

10. If and when she is unable to maintain her current work in the future, which according to Dr. Edwin Richter, III, will be within 10-15 years, Ms. Almonte will not be a candidate for workforce activities.

If additional information is made available, I reserve the right to amend my conclusions as needed.

Respectfully submitted:

*Daniel Wolstein*

Daniel Wolstein, Ph.D., CRC, PVE, CLCP, CRV, IPEC, ABVE/F, LRC
Certified Rehabilitation Counselor
Professional Vocational Evaluator
Certified Life Care Planner
Certified Rehabilitation Vocationologist
International Psychometric Evaluation Certification
Fellow, American Board of Vocational Experts
Licensed Rehabilitation Counselor

Almonte, Lucia                                                                                   40

## RESOURCES AND REFERENCES

1) **Dictionary of Occupational Titles** Revised 4th edition, 1992, U.S. Department of Labor Employment and Training Administration, Government Printing Office, Washington, D.C.

2) **The Revised Handbook for Analyzing Jobs**, 1991, U.S. Department of Labor, Employment and Training Administration, Government Printing Office, Washington, D.C.

3) **Foundations of Forensic Vocational Rehabilitation,** Robinson, R.H., 2014. Springer Publishing Company. New York, New York.

4) **Occupational Outlook Handbook**, 2014 Edition, U.S. Department of Labor Statistics.  Http://www.bls.gov/ooh/

5) **O*Net OnLine (Occupational Information Network),** 2015. https://www.onetonline.org/

6) **Job Browser Pro (Version 1.67).** 2015. Skilltran. Spokane, Washington.

7) **Assessment of Earning Capacity, 3rd Edition,** Shahnasarian, M. 2011. Lawyers and Judges Publishing Company, Inc. Tucson, Arizona.

8) **Manual for the McCroskey Transferable Skills Program**, Version 2015, McCroskey, B.J. Brooklyn Park, MN.

9) **A Guide to Rehabilitation**, Deutsch, P. and Sawyer, H., 2005, Matthew Bender and Company, Albany, NY.

10) **Vocational Assessment:  Evaluating Employment Potential**, Havranek, J., Grimes, J., Field, T. and Sink, J., 2005, Elliott & Fitzpatrick, Inc., Athens, GA.

11) **Rehabilitation Consultant's Handbook**, Field, T. and Weed, R., 2003, Elliott & Fitzpatrick, Inc., Athens, GA.

12) **Strategies for the Rehabilitation Consultant**, Field, T., 1999, Elliott & Fitzpatrick, Inc., Athens, GA.

13) **Assistive Technologies: Principle and Practice, Third Edition**, Cook, A. and Polgar, J., 2008, Mosby Elsevier, St. Louis, Missouri.

Almonte, Lucia                                                                41

ADDENDUM A

MCCROSKEY TRANSFERABLE SKILLS ANALYSIS

RESULTS

LUCIA ALMONTE

**Kincaid Wolstein Vocational and Rehabilitation Services**
One University Plaza, Suite 302, Hackensack, New Jersey 07601
www.KWVRS.com ▪ Tel: (201) 343-0700 ▪ Fax: (201) 343-0757

## MTSP - Report 1

## Client Identification, Labor Market Area, VIPR Type and Reason for Referral

Monday, March 2, 2020

**Client Name:** Almonte, Lucia
**Address1:** ███████
**Address2:**
**City/State/Zip:** Freeport             NY     11520

**Labor Market Area**
Job Bank Name: Nassau
StateParishProvince: New York
Country Name: USA

Year Link: 2020
Inflation Link: 1.351914315
ECLR Link: 1.2041

**VIPRType:** <u>9999</u>    Average Worker

**Referral:**

Vocational Evaluation and Earning Capacity Analysis

## MTSP - Report 3
### Client Worker Trait Profiles

Client: Almonte, Lucia

Monday, March 2, 2020

| Worker Trait Profiles | VQ | GED R M L | Aptitudes S P Q K F M E C | Physical Demands 1 2 3 4 5 6 | Environmental Conditions 1 2 3 4 5 6 7 |
|---|---|---|---|---|---|
| **Profile 1:** Work History Profile | 102.63 | 3 2 3 | 2 2 3 2 2 3 1 2 | 3 0 0 1 1 0 | 1 0 0 0 0 0 0 |
| **Profile 2:** Evaluative Profile | 99.14 | 3 2 3 | 2 2 3 2 2 3 1 2 | 1 0 0 1 1 1 | 1 0 0 0 0 0 0 |
| **Profile 3:** Pre Profile | 102.83 | 3 2 3 | 2 2 3 2 2 3 1 2 | 3 0 0 1 1 1 | 1 0 0 0 0 0 0 |
| **Profile 4:** Post Profile | 99.14 | 3 2 3 | 2 2 3 2 2 3 1 2 | 1 0 0 1 1 1 | 1 0 0 0 0 0 0 |

**Profile 1:** Highest Levels of Worker Trait Functioning demonstrated across Past Relevant Work History over the past 15 years.

**Profile 2:** The Evaluative Data Profile of Current Vocational Functioning derived from demonstrated and retained Work History functioning, confirmed by review of available relevant Medical, Psychological, Social, Educational and Vocational Information and extended through available relevant Vocational Tests, Measures, Ratings and Functional Capacities Assessment data.

**Profile 3:** Highest Levels of Worker Trait Functioning across demonstrated Work History (Profile 1) and Evaluative Data (Profile 2).

**Profile 4:** The Final Adjusted Residual Employability and Earnings Capacity Profile of Vocational Functioning for Job-Person Matching.

Notes: Worker Trait Profile Levels of "4" on GED and Aptitude Traits reflect Middle-Average (50th %ile) Vocational Functioning. The Middle-Average Vocational Quotient (VQ) for Jobs is 100 and for People is 140. Both have a Standard Deviation of 15. Perfect Job-Person Profile Matches are rare. Reasonable Job Matches are typically 22.5 VQ Points below the Person's VQ. *Theoretical Underpinnings of the McCroskey Vocational Quotient System (MVQS) include: Parson's (1909) Informal 3-Part Theory, The Formal Minnesota Theory of Work Adjustment (Dawis, Lofquist & Weiss, 1968), The Vocational Diagnosis and Assessment of of Residual Employability (VDARE, McCroskey, Wattenbarger, Field and Sink, 1977), and the Scientific Research on Job-Person Matching and Earning Capacity Prediction Studies contained in national peer-reviewed Journals including: Vols. 1 - 7 of the Journal of Forensic Vocationology (1995-2014), The Earnings Analyst (TEA) Journals of the American Rehabilitation Economics Association (Vols 1 - 4, 1998 - 2001) and The American Board of Vocational Expert (ABVE) Journals of Forensic Vocational Assessment (Vols 1 - 4, 1996 - 2001). High to Very High Transferable Skills Analysis Validity has been demonstrated.*

# MTSP - Report 4

## Pre - Post Comparisons and Residual Employability

Almonte, Lucia                                                                 Monday, March 2, 2020

## SECTION 5, PART 1:   ACCESS TO THE LABOR MARKET

**Jobs Searched:**     1258      In this Job Bank

### Job Matches in each of the 10 DOT Job Categories*

|  | Prof | TechMgr | ClerSales | Services | Agri | Process | MachTr | Bench | Struct | Misc | - Total - | Access** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JobCats*: | - 0 - | - 1 - | - 2 - | - 3 - | - 4 - | - 5 - | - 6 - | - 7 - | - 8 - | - 9 - | - Total - | Access** |
| Pre: | 0 | 1 | 24 | 19 | 0 | 1 | 0 | 1 | 1 | 1 | 48 | 4 |
| Post: | 0 | 0 | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 1 |
| Residual: | 0% | 0% | 42% | 5% | 0% | 0% | 0% | 0% | 0% | 0% | 23% | 23% |

** *Mean=85, Std Dev=8. Access to Specific Jobs and Earnings depend on Qualifications, Skills, Abilities, General and Specific Educational Development, Aptitudes, Training, Experience, Supply-Demand Factors in Relevant Labor Markets.*

## SECTION 5, PART 2:   EARNING CAPACITY AND TRAINING POTENTIAL

### Overall Earning Capacity: Mean Present Value Earning Capacity Estimates - Pre/Post Summary

#### Note: See Table 4a for EC Rxy, SEe and Confidence Intervals.

|  | Max VQ | Avg VQ | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile | Training Potential** |
|---|---|---|---|---|---|---|---|---|---|
| Pre: | 99.45 | 91.92 | $20.60 | $12.24 | $14.91 | $19.02 | $24.78 | $31.80 | 64 |
| Post: | 95.58 | 93.22 | $20.76 | $12.31 | $15.02 | $19.18 | $25.01 | $32.08 | 62 |
| Residual: | 96% | 101% | 101% | 101% | 101% | 101% | 101% | 101% | 96% |

** *Mean=85, Std Dev=8. Access to Specific Training Programs depend on Qualifications, General and Specific Educational Development, Aptitudes, Motivation, Supply and Demand Factors in Relevant Training Markets and Funding Availability.*

## SECTION 5, PART 3:   TRANSFERABLE SKILLS (TS) AVAILABILITY and UTILIZATION

|  | No TSkills Available | Few, if any TSkills Available | Low TSkills Available | Moderate TSkills Available | High TSkills Available | Utilization** |
|---|---|---|---|---|---|---|
| TS Levels*: | 0 - 19% | 20 - 39% | 40 - 59% | 60 - 79% | 80 - 97% | Utilization** |
| Pre: | 6 | 23 | 9 | 5 | 5 | 6 |
| Post: | 0 | 6 | 2 | 0 | 3 | 1 |
| Residual: | 0% | 26% | 22% | 0% | 60% | 17% |

** *Mean=85, Std Dev=8. Access to TS Jobs depends on Level of Qualifications, Skills, Training, Experience, Availability of Skills Updating/Enhancement Training to Bridge Employment Barriers, a Positive Attitude and a Motivated, Optimistic, Enthusiastic, Persistent and, above all, a Realistic Job Search.*

* *See MVQS2003 Reports: Selected Symbols, Codes and Scales. (MVQS 2003 Resources, p. 42).*

(c) Copyright 2002-2015 by Billy J. McCroskey, Ph.D.

# MTSP - Report 5
## Client Work History Job Demands/Worker Trait Requirements

Almonte, Lucia       **Report 5: Work History Job Demands/Worker Trait Requirements**       Monday, March 2, 2020

| Dot Code | Job Title | VQ | VIPR | SVP | Skill Level | GED | | | Aptitudes | | | | | | | | Physical Demands | | | | | | Environmental Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | R | M | L | S | P | Q | K | F | M | E | C | 1 | 2 | 3 | 4 | 5 | 6 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 237.367-038 | Receptionist | 95.38 | ESFP | 4 | Semi-Skilled | 3 | 2 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 290.477-014 | Sales Clerk | 97.23 | ESTP | 3 | Semi-Skilled | 3 | 2 | 2 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 2 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 301.687-014 | Day Worker | 82.38 | ESTJ | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | 1 | 2 | 2 | 3 | 1 | 1 | 3 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 352.667-010 | Host/Hostess | 95.27 | ESFJ | 3 | Semi-Skilled | 3 | 2 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

(c) Copyright 2002-2015 by Billy J. McCroskey, Ph.D.

## MTSP - Report 7
### Work History by VQ - Present Value Earning Capacity

Almonte, Lucia                    Report 7:  Work History by VQ - Present Value Earning Capacity                    Monday, March 2, 2020

Note: See JOFV Table 4a, for EC Rxy, SEe and Confidence Intervals

| Dot Code | Job Title | VQ | SVP | Skill Level | VA | VIPR | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile |
|----------|-----------|-----|-----|-------------|-----|------|------|----------|----------|----------|----------|----------|
| 290.477-014 | Sales Clerk | 97.23 | 3 | Semi-Skilled | 93% | ESTP | $21.28 | $12.52 | $15.35 | $19.68 | $25.70 | $32.93 |
| 237.367-038 | Receptionist | 95.38 | 4 | Semi-Skilled | 89% | ESFP | $21.04 | $12.42 | $15.19 | $19.45 | $25.38 | $32.54 |
| 352.667-010 | Host/Hostess | 95.27 | 3 | Semi-Skilled | 79% | ESFJ | $21.03 | $12.41 | $15.18 | $19.44 | $25.36 | $32.51 |
| 301.687-014 | Day Worker | 82.38 | 2 | Unskilled | 74% | ESTJ | $19.37 | $11.76 | $14.12 | $17.85 | $23.14 | $29.76 |

# MTSP - Report 8
## Job Matches by Transferable Skills (TS) - Job Demands

Almonte, Lucia                     Job Profile Report 8:  Job Matches by Transferable Skills (TS)  - Job Demands                     Monday, March 2, 2020

| Dot Code | Job Title | TS | VQ | VIPR | VA | SVP | Skill Level | GED | | | Aptitudes | | | | | | | | Physical Demands | | | | | | Environmental Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | R | M | L | S | P | Q | K | F | M | E | C | 1 | 2 | 3 | 4 | 5 | 6 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 237.367-038 | Receptionist | 97% | 95.38 | ESFP | 89% | 4 | Semi-Skilled | 3 | 2 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 237.367-010 | Appointment Clerk | 91% | 91.55 | ESFP | 89% | 3 | Semi-Skilled | 3 | 2 | 3 | 1 | 1 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 237.367-042 | Referral-and-Information Aide | 83% | 95.58 | ESFP | 89% | 3 | Semi-Skilled | 3 | 2 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 239.367-014 | Dispatcher, Maintenance Service | 46% | 95.58 | ESFP | 87% | 3 | Semi-Skilled | 3 | 2 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 249.367-010 | Animal-Shelter Clerk | 40% | 93.13 | ESFP | 93% | 3 | Semi-Skilled | 3 | 2 | 3 | 1 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 249.167-014 | Dispatcher, Motor Vehicle | 23% | 95.38 | ENFJ | 87% | 5 | Semi-Skilled | 3 | 2 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 221.367-070 | Service Clerk | 23% | 94.15 | ISFP | 87% | 4 | Semi-Skilled | 3 | 2 | 2 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 209.687-010 | Checker II | 23% | 89.61 | ENFJ | 87% | 4 | Semi-Skilled | 3 | 2 | 2 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 247.367-010 | Classified-Ad Clerk I | 20% | 95.58 | ENFJ | 89% | 5 | Semi-Skilled | 3 | 2 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 379.367-010 | Surveillance-System Monitor | 20% | 90.63 | ESFP | 86% | 2 | Unskilled | 3 | 1 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 209.687-018 | Reviewer | 20% | 88.82 | ESFP | 87% | 4 | Semi-Skilled | 3 | 1 | 3 | 2 | 2 | 3 | 2 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

(c) Copyright 2002-2015 by Billy J. McCroskey, Ph.D.

# MTSP - Report 10
## Job Matches by Transferable Skills (TS) - Present Value Earning Capacity

Almonte, Lucia                                      Report 10:  Job Matches by Transferable Skills-Present Value Earning Capacity                                      Monday, March 2, 2020

Note: See JOFV Table 4a, for EC Rxy, SEe and Confidence Intervals.

| Dot Code | Job Title | TS | VQ | SVP | VA | VIPR | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile |
|----------|-----------|-----|-----|-----|-----|------|------|----------|----------|----------|----------|----------|
| 237.367-038 | Receptionist | 97% | 95.38 | 4 | 89% | ESFP | $21.04 | $12.42 | $15.19 | $19.45 | $25.38 | $32.54 |
| 237.367-010 | Appointment Clerk | 91% | 91.55 | 3 | 89% | ESFP | $20.55 | $12.23 | $14.88 | $18.98 | $24.72 | $31.72 |
| 237.367-042 | Referral-and-Information Aide | 83% | 95.58 | 3 | 89% | ESFP | $21.07 | $12.43 | $15.21 | $19.48 | $25.42 | $32.58 |
| 239.367-014 | Dispatcher, Maintenance Service | 46% | 95.58 | 3 | 87% | ESFP | $21.07 | $12.43 | $15.21 | $19.48 | $25.42 | $32.58 |
| 249.367-010 | Animal-Shelter Clerk | 40% | 93.13 | 3 | 93% | ESFP | $20.75 | $12.31 | $15.01 | $19.17 | $24.99 | $32.06 |
| 249.167-014 | Dispatcher, Motor Vehicle | 23% | 95.38 | 5 | 87% | ENFJ | $21.04 | $12.42 | $15.19 | $19.45 | $25.38 | $32.54 |
| 221.367-070 | Service Clerk | 23% | 94.15 | 4 | 87% | ISFP | $20.89 | $12.36 | $15.09 | $19.30 | $25.17 | $32.28 |
| 209.687-010 | Checker II | 23% | 89.61 | 4 | 87% | ESFP | $20.30 | $12.13 | $14.72 | $18.74 | $24.38 | $31.30 |
| 247.367-010 | Classified-Ad Clerk I | 20% | 95.58 | 5 | 89% | ENFJ | $21.07 | $12.43 | $15.21 | $19.48 | $25.42 | $32.58 |
| 379.367-010 | Surveillance-System Monitor | 20% | 90.63 | 2 | 86% | ESFP | $20.43 | $12.18 | $14.80 | $18.87 | $24.56 | $31.52 |
| 209.687-018 | Reviewer | 20% | 88.82 | 4 | 87% | ESFP | $20.20 | $12.09 | $14.65 | $18.64 | $24.25 | $31.14 |

(c) Copyright 2002-2015 by Billy J. McCroskey, Ph.D.

**Daniel Wolstein, PhD, CRC, PVE, CLCP, CRV, IPEC, ABVE/F, LRC**
One University Plaza, Suite 302 ▪ Hackensack, New Jersey ▪ 201-343-0700

## Listing of Court Appearances Previous Four-Year Period

11/21/17    Workers Compensation Court
State of New Jersey Department of Labor and Workforce Development
Hudson County
Jersey City, New Jersey
Judge Jamie Buonocore
Floralba Avendano v. Target Corporation
Claim Petition No.: 2006/15760

2/8/18    Superior Court of New Jersey
Chancery Division – Family Part
Hunterdon County Justice Center
Flemington, New Jersey
Judge Julie Marino
Caroline Ranger v. Frederic Simard
Docket No.: FM/10/225/16

9/12/18    Superior Court of New Jersey
Chancery Division – Family Part
Somerset County
Somerville, New Jersey
Judge John McDonald
Karalyn Rosenblum v. Mark Rosenblum

10/4/18    Superior Court of New Jersey
10/5/18    Chancery Division – Family Part
Essex County
Newark, New Jersey
Judge David B. Katz
Daniel Mayo v. Jamie Mayo

11/9/18    Supreme Court of New York
Dutchess County
Poughkeepsie, New York
Judge James V. Brands
James Murray and Lynn Murray v. Home Depot, USA Inc.

12/5/18    Supreme Court of New York
Richmond County
Staten Island, New York
Judge Alan C. Marin
Roberto Ortega v. Opus Development Group Ltd.

12/14/18    Supreme Court of New York
12/17/18    Westchester County
            White Plains, New York
            Judge John Colangelo
            Samantha Podesta v. Joseph Podesta
            Index No.: 576172017

3/8/19      Supreme Court of New York
            Bronx County
            Bronx, New York
            Judge Fernando Tapia
            Santos Uvidia v. The Cardinal Spellman High School and Archdiocese
            Index No.: 306692/2012

3/11/19     Superior Court of New Jersey
            Chancery Division – Family Part
            Somerset County
            Somerville, New Jersey
            Judge Robert Ballard
            Peter Wright v. Elizabeth Brady Wright
            Docket No.: FM-18-298-12

3/14/19     Supreme Court of New York
            Kings County
            Brooklyn, New York
            Judge Bernard Graham
            Albert Masmalaj v. NYC Economic Development Corporation
            Index No.: 7555/14

4/22/19     Superior Court of New Jersey
            Passaic County
            Paterson, New Jersey
            Judge Thomas LaConte
            Barbara Payton v. Peter Berger, D.C.
            Docket No.: PAS-L-2668-16

05/31/19    Superior Court of New Jersey
            Somerset County
            Somerville, New Jersey
            Video Deposition Testimony
            Christine Reiss v. Warren Medical Center et al.
            Docket No.: SOM-L-830-16

07/25/16    Superior Court of New Jersey
            Hudson County

Newark, New Jersey
Video Deposition Testimony
Timothy Mahoney v. Union Paving and Construction Company
Docket No.: HUD-L-0433-17

09/27/19    Supreme Court of New York
Nassau County
Mineola, New York
Judge Leonard Steinman
Michael Carucci v. Town of Hempstead and Andrew P. Carbone
Docket No.: 601096/16

10/01/19    Supreme Court of New York
Kings County
Brooklyn, New York
Judge Reginald Boddie
Cathie Mathurin v. David Y. Shalom and BH Contractor Inc.
Docket No.: 502729/2017

10/03/19    Supreme Court of New York
Bronx County
Bronx, New York
Judge Norma Ruiz
Oscar Avila v. 265 Wythe, LLC, et al.
Docket No.: 306785/2013

10/08/19    Superior Court of New Jersey
Bergen County
Hackensack, New Jersey
Judge Darren DiBlasi
Laura Grube v. Michael Grube
Docket No.: FM-02-1936-18

10/23/19    Superior Court of New Jersey
Bergen County
Hackensack, New Jersey
Judge Mary Thurber
Mark Eiseman v. Richard Rhim, M.D., et al.
Docket No.: BER-L-2334-16

11/21/19    Supreme Court of New York
New York County
New York, New York
Judge Julio Rodriguez
Sommer Carbuccia v. New York City Transit Authority, et al.
Docket No.: 156715/2014

01/10/20    Superior Court of New Jersey
Bergen County
Hackensack, New Jersey
Judge Jane Gallina-Mecca
Qingyou Yan v. Yixiong Xu
Docket No. FM-02-2387-18

01/17/20    Superior Court of New Jersey
Bergen County
Hackensack, New Jersey
Video Deposition Testimony
Luz Jerez v. Steven Bartlett et al.
Docket No. BER-L-73-18

01/27/20    United States District Court of New Jersey
Essex County
Newark, New Jersey
Judge Brian Martinotti
Ernest Hinson Jr. v. United States of America
Docket No. 3:18-CV-00870-BRM-LHG

02/26/20    Superior Court of New Jersey
Bergen County
Hackensack, New Jersey
Judge James Guida
Leron Bensoussan v. Richard Bensoussan
Docket No. FM-02-2484-18

**Daniel Wolstein, PhD, CRC, PVE, CLCP, CRV, IPEC, ABVE/F, LRC**
One University Plaza, Suite 302 ▪ Hackensack, New Jersey ▪ 201-343-0700

## Listing of Deposition Appearances Previous Four-Year Period

03/19/18    Mark and Carol Eiseman v. Richard Rhim, M.D., Joshua Rovner, M.D.
Krompier & Tamn
Superior Court of New Jersey
Law Division: Bergen County
Docket No.: BER-L-2334-16

04/11/18    Daniel Mayo v. Jamie Mayo
Greenbaum, Rowe, Smith & Davis
Roseland, New Jersey
Superior Court of New Jersey
Law Division: Essex County
Docket No.: FM-07940-14

04/18/18    Barbara Payton v. Peter Berger, D.C.
Mattia & McBride
Fairfield, New Jersey
Superior Court of New Jersey
Law Division: Passaic County
Docket No.: PAS-L-2668-16

08/24/18    Shenna Petty v. Green Earth, Inc., et al.
Gilman & Bedigian
Timonium, Maryland
Circuit Court for Baltimore City
Case No.: 24-C-17-004450 OT

10/17/18    Luz A. Nunez v. Mordecai D. Katz, et al.
Law Offices of Jeffrey Hasson
Teaneck, New Jersey
Superior Court of New Jersey
Law Division: Bergen County
Docket No.:  BER-L-3279-16

01/18/19    Steven Catalano v. J & M Realty Development Corp.
Robert E. Taylor, Jr., Attorney at Law
Kenilworth, New Jersey
Superior Court of New Jersey
Law Division: Essex County
Docket No.: ESX-L-6696-16

05/24/19    Laura Diaz v. ShopRite of Perth Amboy, et al.

Stathis & Leonardis
Edison, New Jersey
Superior Court of New Jersey
Law Division: Middlesex County
Docket No.: MID-L-03946-16

06/07/19   Barbara Wilde v. Byron Charles Mischen, MD et al.
Florham Park, New Jersey
Searcy, Denney, Scarola, Barnhart & Shipley, PA
Circuit Court of the Sixth Judicial Circuit, Pinellas County, Florida
Case No. 522017CA006063xxcici

06/24/19   Ilhan Alici v. Whole Foods Market
Roseland, New Jersey
Brach Eichler
Superior Court of New Jersey
Law Division: Passaic County
Docket No.: PAS-L-4081-17

07/25/19   Timothy Mahoney v. Union Paving and Construction Company et al.
Newark, New Jersey
Icaza & Burgess
Superior Court of New Jersey
Law Division: Hudson County
Docket No.: L-433-17

01/03/20   Denise DeMartine v. Air-win Corporation et al.
Wayne, New Jersey
Law Offices of Jonathan Marshall
Superior Court of New Jersey
Law Division: Ocean County
Docket No.: OCN-L-2590-17

02/07/20   Justeen Adams v. Borough of Red Bank et al.
Hazlet, New Jersey
Cimino & Filippone
Superior Court of New Jersey
Law Division: Monmouth County
Docket No.: MON-L-1878-18

02/17/20   Steven Beck v. Ponky, LLC, et al.
Parsippany, New Jersey
Law Office of Edward C. Lutz
Superior Court of New Jersey
Law Division: Sussex County
Docket No.: SSX-L-441-18

03/30/20    Nehme Jaafar v. Alan Miller, M.D., et al.
                Video Deposition
                United States District Court
                Southern District of New York
                Index No.: 17-CV-9262

04/24/20    Donna Castrianni v. Quail Heights Partnership, et al.
                Video Deposition
                Superior Court of New Jersey
                Law Division: Bergen County
                Docket No.: BER-L-8116-18

| | |
|---|---|
| Vocational Evaluation / Earning Capacity Analysis | $5,000 |
| Life Care Plan | $6,000 |
| Vocational Evaluation / Earning Capacity Analysis & Life Care Plan | $10,000 |
| Court Appearance | $3,500 |
| Deposition | $2,000 |
| Preparation for Court Appearance or Deposition | $375/hour |
| Interview No-Show / Cancellation (under 72 hours) | $750 |
| Travel Surcharge | $375 |

Expedited Report Surcharge (from interview date):
1-7 Day Turnaround ... $5,000
8-14 Day Turnaround ... $3,750
15-29 Day Turnaround ... $2,500

Supplemental / Addendum / Revision
Any edit requested beyond 30 days after the original draft report is *completed* (excluding internal error) ... $375/hour

*Extensive or Delayed Medical Record Summarization
Any summarizing of medical records in excess of 1,000 pages or received after interview has occurred ... $375/hour

[*continued on next page*]





**Refundability:**

- Personal injury cases withdrawn within 30 days of signing the Professional Services Agreement are refundable less a $2,500 case intake fee
- Personal injury cases withdrawn after 30 days of signing the Professional Services Agreement are nonrefundable
- Testimony fees are 100% refundable if notice of cancellation/rescheduling is provided 5 or more days before appointment date/time; 50% refundable if notice is provided between 2 and 5 days before appointment date/time; and nonrefundable if notice is provided within 48 hours of appointment date/time

**Resumption of Deferred Cases:**

- Reports requiring update beyond two years of the original draft report date are regarded as new cases and are invoiced at 75% of the *current* appropriate fee schedule
    - E.g., a life care plan originally composed 3 years ago and requiring update today would be billed at $4,500 (75% of $6,000 current life care plan fee)